1999 ME 141

**STATE of Maine**

v.

**Harold CLARKE Jr.**

Supreme Judicial Court of Maine.

Argued Sept. 8, 1999.

Decided Oct. 13, 1999.

Andrew Ketterer, Attorney General, Donald W. Macomber, Asst. Attorney General, (orally), Thomas L. Goodwin, Asst. Attorney General, Augusta, for State.

Steven C. Peterson (orally), West Rockport, for defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, and CALKINS, JJ.

CALKINS, J.

[¶ 1] Harold Clarke appeals from a judgment of conviction of manslaughter entered after a jury trial in the Superior Court (Knox County, *Mead, J.*). On appeal, Clarke challenges the sufficiency of the evidence, two prosecutorial comments, and the admission of an expert's testimony. We affirm the judgment.

[¶ 2] Clarke was convicted of the manslaughter of Deanna Wadsworth, who was age four at the time of her death on November 7, 1994. The State's theory of the case was that Deanna was a battered child who died as the result of an injury inflicted by Clarke. The defense theory was that the evidence failed to eliminate Deanna's mother, Tamara Wadsworth, as the batterer.

[¶ 3] Tamara Wadsworth moved to Rockland from Massachusetts with Deanna in 1993 to be near her family and to work at the Rockland Cafe, owned by her sister and brother-in-law. Wadsworth met Clarke, an urchin diver, at the cafe and began dating him. She and Deanna moved into Clarke's apartment in Rockland in May 1994.

[¶ 4] In early October 1994, a large "goose-egg" appeared on Deanna's forehead after she reportedly ran into a doorknob, with Clarke as the only witness. She reinjured the same spot on October 17, falling in the bathtub while being bathed by Clarke. When Tamara asked Clarke about that injury he got angry and threw her clothes on the lawn. This incident caused Tamara and Deanna to move to a relative's home, but they moved back to Clarke's apartment a week or so later.

[¶ 5] There was conflicting evidence regarding Clarke's relationship with Deanna. Clarke and Tamara were engaged, and he hoped to marry her on the weekend of November 12–13. Tamara thought Clarke got along fine with Deanna, and Deanna told Tamara at one point that she wanted Clarke to be her daddy. On the other hand, witnesses testified that Clarke called Deanna "a bitch"; that he complained that she was coming between him and Tamara and that Tamara was choosing her over him; and that he stated he disliked Deanna and she disliked him. A witness testified that Clarke said Deanna was trying to break up his relationship with Tamara. Witnesses also testified that Clarke said Deanna intentionally wet her pants when he babysat her in an attempt to cause a separation between him and Tamara.

[¶ 6] In the week before she died, Deanna frequently felt sick and ate poorly. Tamara took her to a pediatrician, Dr. Howard, on November 1, but he found nothing extraordinary. On November 6, Deanna did not feel well and was nauseous. That evening, after eating, she said her tummy ached. Tamara bathed Deanna and saw no bruises on her stomach or chest, although two witnesses testified that Tamara had previously shown them such bruises. Deanna, Tamara, and Clarke were the only people in the one-bedroom apartment on the night of November 6. Deanna fell asleep on the bed, and Tamara and Clarke slept on the two couches. Ta-

mara woke in the middle of the night and saw Clarke coming out of the bathroom with Deanna. It appeared to Tamara that Clarke walked Deanna into the door frame, causing her to hit her head. According to Clarke, in his statement to the detectives, Deanna vomited at 1 or 2 A.M.

[¶ 7] On the morning of November 7, Deanna felt sick and said her belly ached. Tamara went to work at 7:25 A.M., and Clarke stayed home with Deanna. Tamara came home to check on Deanna at approximately 11 A.M. Deanna still felt sick, and she may have been vomiting. Tamara noticed multiple small bruises on her abdomen that looked like thumb prints. According to Tamara, Clarke denied knowing anything about the bruises and questioned why she wanted to take Deanna to the doctor. Tamara left to buy ginger ale for Deanna, returned with it, and then went back to work between 11:30 and noon.

[¶ 8] At approximately 1:25 P.M. Clarke called Tamara at work and told her to come home at once because Deanna was not breathing. He called 911 and yelled to a neighbor, Aime Lee, who came and helped him perform CPR on Deanna. Clarke told Lee and the emergency medical technicians that Deanna got up from the couch and went into the bathroom to throw up. He heard a thud and found her lying on the bathroom floor, not breathing. He repeated that story to the detectives later that day. Tamara testified that while the emergency medical technicians worked on Deanna, Clarke said "Oh my God, they're going to put me in jail for murder."

[¶ 9] Deanna was taken by ambulance to the hospital where she was pronounced dead after resuscitation efforts. Her abdomen was grossly distended, and there were multiple bruises to the chest, abdomen, and other areas. According to Dr. Howard, who pronounced her death, it was obvious that she had been battered and bled to death.

[¶ 10] Dr. Sweeney, Assistant Chief Medical Examiner, performed the postmortem. She found 650 milliliters of blood in Deanna's abdomen, approximately half her blood volume. There was also air and fecal matter in the abdomen from a ruptured colon. The massive bleeding resulted from multiple internal injuries. There were multiple tears, hemorrhages, and lacerations to the large and small intestine and the liver, with scarring indicative of older injuries. The cause of death was bleeding into the abdomen caused by blunt force trauma. Microscopic analysis of the injuries indicated that the various hemorrhages were of differing ages, some having occurred less than three to four hours before death. According to Dr. Sweeney, Deanna was a victim of battered child syndrome.

[¶ 11] Clarke was indicted for manslaughter, 17–A M.R.S.A. § 203(1)(A) (Supp.1998). Venue was changed to Penobscot County due to pretrial publicity in Knox County. The first trial, in June 1996, ended in a mistrial when the jury deadlocked. The case was retried in October 1997, and the jury found Clarke guilty.[1]

## I. SUFFICIENCY OF THE EVIDENCE

[¶ 12] When a conviction is challenged for insufficiency of the evidence, we set the conviction aside only if, after viewing the evidence in the light most favorable to the prosecution, no factfinder rationally could have found the essential elements of the crime beyond a reasonable doubt. *See State v. McKenney,* 459 A.2d 1093, 1096 (Me.1983).

[¶ 13] Clarke does not dispute that Deanna was battered to death nor does he dispute that whoever killed Deanna was

---

1. The court sentenced Clarke to fifteen years imprisonment with all but nine years suspended and six years probation.

guilty of manslaughter. He argues that the State did not prove beyond a reasonable doubt that the killer was him and not Tamara.

[¶ 14] Substantial circumstantial evidence pointed to Clarke as the killer. Multiple witnesses testified as to Clarke's hostility towards Deanna because she was threatening his relationship with Tamara. The State's expert, Dr. Ricci, testified that the large hematoma on Deanna's forehead was inconsistent with Clarke's explanation that she had hit her head on a doorknob and fallen in the bathtub. He also testified that Clarke's version of events regarding Deanna's collapse on the bathroom floor was impossible because a child who had lost half her blood could not stand up without passing out, let alone walk to the bathroom. Even Clarke's expert testified that it would be surprising that Deanna could walk to the bathroom in that condition. Dr. Sweeney's dating of Deanna's bruises suggested that her fatal injuries were inflicted while Clarke had unhindered access to her and during periods when Tamara saw her only briefly and with Clarke present. Tamara, the only plausible alternative suspect, denied that she was responsible for Deanna's death.

[¶ 15] Clarke essentially argues credibility and weight of the evidence, but these factors are within the sole province of the factfinder. *See State v. Harper,* 675 A.2d 495, 497 (Me.1996). A jury rationally could have concluded beyond a reasonable doubt that Clarke recklessly or with criminal negligence caused Deanna's death. *See* 17–A M.R.S.A. § 203(A)(1); *State v. Michaud,* 1998 ME 251, ¶ 11, 724 A.2d 1222, 1228. The evidence is sufficient to sustain the conviction.

## II. FIRST PROSECUTORIAL COMMENT

[¶ 16] Clarke claims that the prosecutor made two statements during the trial that were improper and require reversal of the conviction. The first statement concerned a pregnancy by Tamara that ended in abortion. Prior to the first trial Clarke moved *in limine* to exclude any reference to Tamara's abortion, and the motion was granted without opposition by the State. Prior to the second trial Clarke requested that the trial court renew the previous order, and the request was granted. During his opening statement, the prosecutor said: "At some point, Tammy got pregnant again. And that was an issue between them, the two young people. Ultimately, that pregnancy ended with an abortion." Clarke moved for a mistrial based upon the statement.

[¶ 17] We review a motion for a mistrial for abuse of discretion. *See State v. White,* 570 A.2d 823, 824 (Me.1990). "Because of the superior vantage point of the trial court, we will overrule its decision only for exceptionally prejudicial circumstances or prosecutorial bad faith." *State v. Ardolino,* 1997 ME 141, ¶ 16, 697 A.2d 73, 79.

[¶ 18] The prosecutor stated that he had forgotten about the *in limine* ruling. There is no suggestion that the prosecutor was acting in bad faith nor are any exceptionally prejudicial circumstances apparent. Clarke argues that jurors with strong feelings about abortion might surmise that he had forced Tamara to have the abortion and thus become prejudiced against him. The trial court noted that the abortion would be more apt to engender negative feelings toward Tamara, which would not prejudice Clarke since his defense strategy was to portray her as a more likely child-killer. Furthermore, the trial judge instructed the jury twice, prior to counsels' opening statements and after closing arguments, that the statements and arguments of counsel were not evidence. We agree with the trial court that the prosecutor's reference to Tamara's abortion in his opening statement did not deny a fair trial to Clarke and did not provide a basis for a mistrial.

## III. SECOND PROSECUTORIAL COMMENT

[¶ 19] The second remark by the prosecutor concerns the fact that Clarke chose not to testify. During his rebuttal closing argument, the prosecutor stated the following:

And where's [Clarke's] statement that that happened there. You look in vain in the statement that he made to the police on the day this happened for any indication that Tammy did anything to Deanna.

And it's three years later now. He might not have said anything about it that day, in the furor or hubbub that's going on about Deanna's death. But as I say, it's three years later now, and he's on trial for punching Deanna and killing her himself.

And if Deanna [*sic*] had done anything like that while she was there on that visit that morning, you would have heard about it by now.

[¶ 20] In the first part of this remark the prosecutor was clearly referring to Clarke's statement to the detectives on the day of Deanna's death. Standing alone this comment would not be understood to be a comment on Clarke's failure to testify at trial. The second portion of the remark, however, contains a reference to Clarke's not having said anything more in the three years since Deanna's death, and it could be interpreted as calling attention to the fact that Clarke did not testify at trial.

[¶ 21] We must first determine what standard of review is applicable. Clarke's counsel did not object to the prosecutor's comment. Ordinarily we review an alleged trial error to which no objection was made under the obvious error standard. *See* M.R.Crim. P. 52(b); *State v. Pelletier*, 673 A.2d 1327, 1330 (Me.1996).

In a similar case raising the issue of a prosecutor's comment on the defendant's failure to testify, we applied the obvious error standard because the defendant did not object to the comment. *State v. Lewis*, 1998 ME 83, ¶ 7, 711 A.2d 119, 122. In *State v. Inman*, 350 A.2d 582, 592–594 (Me.1976), however, we applied, without discussion as to the applicable standard, the harmless error standard of review even though the defendant had failed to object to the prosecutor's comment on his failure to testify.

[¶ 22] In *State v. Tibbetts*, 299 A.2d 883 (Me.1973), we set forth the framework to analyze claims of improper prosecutorial comment under the harmless error standard. Clarke urges us to apply the *Tibbetts* analysis in this situation. The State, on the other hand, asks us to abandon the *Tibbetts* analysis, arguing that *Tibbetts* no longer conforms to the federal standard for determining whether a prosecutor's comments violate a defendant's Fifth Amendment guarantee against self-incrimination.[2]

[¶ 23] We conclude that there is no good reason for departing from the obvious error analysis when the defendant fails to object to an improper prosecutorial comment which calls attention to the defendant's failure to testify at trial. The *Tibbetts* analysis is applicable only in cases in which an objection has been made and the harmless error standard of review is appropriate. For that reason, we do not utilize *Tibbetts* for this case, and we have no occasion for determining that *Tibbetts* is no longer viable in a harmless error case.

[¶ 24] We have defined obvious error as error that is "so highly prejudicial that it taints the proceedings and virtually deprives the defendant of a fair trial." *State*

---

2. The federal standard is "whether, in the circumstances of the particular case, the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Roberts*, 119 F.3d 1006, 1015 (1st Cir.1997). That test originated with *Morrison v. United States*, 6 F.2d 809, 811 (8th Cir. 1925).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*v. Comer,* 644 A.2d 7, 9 (Me.1994). The first step is to determine whether the prosecutor's comment was error. The trial court determined that there was no error and based that conclusion upon a factual finding that the prosecutor did not intend his words to be a comment on Clarke's failure to testify and a finding that the jury would not "naturally and necessarily" take the statement as a comment on the failure to take the witness stand. We acknowledge the trial court's superior vantage point to evaluate the context, tone and effect of the statement, but we note that the comment is close to crossing the line into impermissibility. We do not need to determine, however, whether the trial court committed clear error in finding that the comment here was not improper. Even if we assume that the comment is improper, it does not rise to the level of obvious error. The comment, when taken in context, did not taint the proceedings or virtually deprive Clarke of a fair trial.

[¶ 25] In *United States v. Wihbey,* 75 F.3d 761, 768–771 (1st Cir.1996), the government's summation included a comment that the only witnesses who provided any explanation of what had occurred were called by the government. The court found the statement to be an impermissible comment on the defendant's failure to testify, but the comment did not rise to the level of "plain error," the federal equivalent of obvious error. *Id.* at 769–770. In making this determination the court looked at the jury instruction given by the trial court on the defendant's right to not testify, as well as the significant, but not overwhelming, evidence of guilt. *Id.* at 770–771.

[¶ 26] In this case the context of the comment is that it was made in rebuttal and in response to Clarke's closing argument in which Clarke's counsel reviewed the evidence supporting Clarke's theory that it was more likely that Tamara delivered the fatal blow. The prosecutor responded to this contention by inferring that it came from Clarke's lawyer, not Clarke himself, and that Clarke had plenty of time to tell someone about his belief that Tamara was the guilty one.

[¶ 27] Furthermore, the trial court instructed the jury twice that the opening and closing statements of counsel were not evidence. The court also told the jury that the fact that Clarke chose not to testify was not evidence; that Clarke had an absolute right not to testify; that the jury was not permitted to speculate or guess why he did not testify; and that the jurors were to assign no weight whatsoever to the fact that he did not testify. These instructions removed any taint caused by the prosecutor's comment and insured that the jurors would not consider Clarke's failure to take the stand.

[¶ 28] The combination of the context of the prosecutor's comment, the strong instructions of the trial court to the jury, and the substantial evidence of guilt lead us to conclude that the prosecutor's comment was not so highly prejudicial that it tainted the proceedings and virtually deprived the defendant of a fair trial.

## IV. DR. RICCI'S TESTIMONY

▮ [¶ 29] Dr. Ricci became familiar with the facts in this case when the Child Death and Serious Injury Review Panel,[3] of which he was chairman, reviewed the case in December 1996. At trial, Dr. Ricci, a board-certified pediatrician and emergency physician and director of a child abuse program, gave his opinion that Deanna was a chronically and acutely abused child. He testified extensively, from his review of the medical records, about Deanna's injuries. Clarke contends that Dr. Ricci's testimony violated his right to due process because Dr. Ricci's knowledge of the case stemmed from his chairmanship of the Child Death and Serious Injury Review Panel, and neither Clarke nor his counsel had the opportunity to be present

**3.** The Panel is established by 22 M.R.S.A. § 4003(1)(E) (Supp.1998).

when the Panel reviewed Deanna's case. This due process argument is raised for the first time on appeal, and we therefore review it for obvious error. *See State v. Poulliot,* 1999 ME 39, ¶ 14, 726 A.2d 210, 214. Dr. Ricci was fully qualified to testify about Deanna's medical condition and the abuse demonstrated by her medical records. The fact that he learned about the case because of the Panel does not make his testimony inadmissible or violate Clarke's constitutional rights. The admissibility of Dr. Ricci's testimony is not obvious error.

The entry is:

Judgment affirmed.

