2001 ME 42

**STATE of Maine**

v.

**Jeffrey SOULE.**

Supreme Judicial Court of Maine.

Submitted on Briefs: Jan. 31, 2001.
Decided: March 5, 2001.

Geoffrey A. Rushlau, District Attorney, Leane Zainea, Deputy Dist. Atty., Belfast, for State.

John L. Carver, Joseph W. Baiungo, Carver, Kimball & Baiungo, Belfast, for defendant.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

RUDMAN, J.

[¶ 1] Jeffrey Soule appeals from the judgment of conviction for aggravated criminal trespass (Class C), 17–A M.R.S.A. § 402–A (Supp.2000),[1] entered in the Superior Court (Waldo County, *Pierson, J.*) after a jury trial. He contends the trial court erred when it refused to instruct the jury on the defense of competing harms.[2] We agree and vacate the judgment.

## I. FACTS AND PROCEDURE

[¶ 2] On the weekend of October 23–24, 1999, Soule, Soule's then-girlfriend Jeanette Perry, and a number of children were vacationing at the Soule family camp located on Millstone Island in Big Lake St. George in Liberty. In the early evening of October 23, Soule and Perry stopped at the residence of Meghan Small and Michael Vogt, which was located on Little Lake St. George in Liberty. Soule and Perry believed that they would find Aaron Normandin—a mutual friend of the parties—there. Normandin told Soule earlier in October that there was going to be a barbecue at the Small and Vogt residence ("Vogt residence") that weekend and invited Soule and Perry to join him there.[3] Finding no one at home, Soule and Perry taped a note on the door of the residence stating that they had stopped by to visit and asked Normandin to contact them when he returned.[4]

---

1. 17–A M.R.S.A. § 402–A provides, in relevant part:

    1. A person is guilty of aggravated criminal trespass if, knowing that that person is not licensed or privileged to do so, that person enters a dwelling place and:
    A. While in the dwelling place violates any provision of chapter 9 [17–A M.R.S.A. §§ 201 to 212] or chapter 11 [17–A M.R.S.A. §§ 251 to 258];
    . . . .
    17–A M.R.S.A. § 402–A(1)(A) (Supp.2000).

2. 17–A M.R.S.A. § 103 states:

    1. Conduct which the actor believes to be necessary to avoid imminent physical harm to himself or another is justifiable if the desirability and urgency of avoiding such harm outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the statute defining the crime charged. The desirability and urgency of such conduct may not rest upon con-

siderations pertaining to the morality and advisability of such statute.
    2. When the actor was reckless or criminally negligent in bringing about the circumstances requiring a choice of harms or in appraising the necessity of his conduct, the justification provided in subsection 1 does not apply in a prosecution for any crime for which recklessness or criminal negligence, as the case may be, suffices to establish criminal liability.
    17–A M.R.S.A. § 103 (1983).

3. Small and Vogt claim that neither of them made any plans with Normandin for that weekend and their relationship with Normandin was not such that Normandin would arrive unannounced at their home.

4. According to Soule and Perry, the note stated something to the effect of: "Aaron, we stopped by, give us a call. Jeff and Jeanette ." They also left telephone numbers at which they could be reached. According to

[¶ 3] Later that evening, when Soule and Perry left the camp for approximately 30 minutes to pick up pizza and a bottle of wine from the mainland, Vogt called in response to their note and "said a few provocative things" to Soule's niece and daughter. As a result of Vogt's comments to the girls, the parties exchanged a number of angry telephone calls that evening and in the early morning hours of October 24.

[¶ 4] According to Small and Vogt, Soule's uninvited arrival at their residence was the culmination of the calls. Vogt claimed he had his back to Soule and was making a sandwich when Soule "walked through [the] plate glass window" of the deck door. Once inside, Vogt claims Soule launched at him, hitting him in the face with such a force that it sent him across the room, where he "blacked out for ... maybe ten seconds or so." When he awoke, Vogt saw that Soule was assaulting Small. Trying to find something with which to hit Soule, Vogt grabbed an unloaded shotgun that he had left in a corner after hunting earlier that day. Vogt said Soule grabbed the gun from him and pointed it at Small and Vogt, threatening them with it. Vogt testified that Soule ran out of the door when the phone rang, taking the gun with him.[5]

[¶ 5] Soule and Perry, however, testified that Soule's involvement in the telephone dispute was minimal and that he was invited to the Vogt residence to peaceably resolve the matter. Soule testified that his first contact with Vogt occurred when Vogt called at 2:30 a.m. on October 24. When Soule answered the phone, he said Vogt was yelling at him and demanding that Perry stop calling the Vogt residence. Soule stated, "I waited for him to stop yelling, and I informed him in a fairly restrained voice that I did not need to deal with him, that I could just call the police and let them deal with it." With the mention of the police, Soule said Vogt's demeanor instantly changed. According to Soule, Vogt implored him not to call the police and, appealing to their common friendship with Normandin, encouraged Soule to "come over so that he could meet [him] and explain that he wasn't a bad guy." Soule agreed to meet with Vogt that night, travelling by motorboat to Vogt's residence.

[¶ 6] When he arrived at the Vogt residence, Vogt was talking to someone on the phone and had his back to the deck door at which Soule was standing. Soule said he knocked on the door and Vogt turned with a gun in his hands, levelling it at Soule. After a "split-second" determination that he could not safely get away,[6] Soule testified, "I threw my elbow and my shoulder into the window and smashed through the window and dived at [Vogt] and grabbed at the gun." While they were wrestling for the gun, Soule said Small hit him in the head with a frying pan.[7] In an effort to stop her from striking him again, Soule said he grabbed Small by the hair and pulled her to the floor. After disarming Vogt, Soule said he left the Vogt residence and ran to his boat, taking Vogt's gun with him. Once in the boat, Soule unloaded the gun and threw it into the lake.

[¶ 7] After Soule fled the Vogt premises, Small called the police. Soule was charged with burglary (Class B), 17–A M.R.S.A.

Small and Vogt, however, the note was urgent in tone and beckoned them to call immediately.

5. Soule testified that he did not hear a phone ringing when he left the Vogt residence that night.

6. Soule provided two reasons for his so-called "split-second" decision to enter, rather than to flee from, the Vogt residence. First, he testified that the deck was situated roughly 12 feet off the ground, and he believed he could not safely jump from the deck. Second, Soule testified that his boat was not working properly, and he was worried that it could stall, not allowing him to get away.

7. Small testified that, though she did attempt to hit Soule with the frying pan, he took the pan from her before she was able to strike him with it.

§ 401(1) (1983); aggravated criminal trespass (Class C), 17–A M.R.S.A. § 402–A(1)(A) (Supp.2000); theft of a firearm (Class B), 17–A M.R.S.A. § 353(1) (1983); and assault (Class D), 17–A M.R.S.A. § 207(1) (1983). Prior to the trial, the burglary charge was dismissed. Subsequently, the jury acquitted Soule of the assault and theft charges but convicted him of aggravated criminal trespass. Soule timely filed a Motion for a New Trial or Acquittal. The trial court denied the motion. Soule appealed.

## II. DISCUSSION

[¶ 8] "We review jury instructions 'as a whole to ensure that they informed the jury correctly and fairly in all necessary respects of the governing law.'" *State v. Day*, 1999 ME 29, ¶ 8, 724 A.2d 1245, 1247 (quotation omitted). "A jury instruction that 'creates the possibility of jury confusion and a verdict based on impermissible criteria' is erroneous." *Id.* (quoting *State v. Rivers*, 634 A.2d 1261, 1263 (Me.1993)). "Such an error is harmless only if the court believes it highly probable that it did not affect the verdict." *Id.* (quoting *State v. Fitch*, 600 A.2d 826, 828 (Me.1991)). We "review the trial court's denial of a request for jury instructions for prejudicial error." *State v. Doyon*, 1999 ME 185, ¶ 7, 745 A.2d 365, 367.

[¶ 9] The court instructed the jury on self-defense and the use of deadly force. In the bench conference prior to the court's retirement of the jury for deliberations, Soule requested a jury instruction on the "competing harms" defense; he raised the issue again in his Motion for a New Trial or Acquittal. The trial court denied Soule's request in both instances, finding that only the self-defense instruction was generated by the evidence of the case. Soule properly objected. *See State v. Poole*, 568 A.2d 830, 830 (Me.1990) (finding no error in trial court's refusal to give instruction because, *inter alia*, the defendant failed to make any objection to the instruction actually given).

[¶ 10] Soule contends the trial court erred by refusing to instruct the jury on the defense because the facts of the case were sufficient to generate the "competing harms" defense. A defendant is entitled to an instruction when he can point to the existence of evidence "sufficient to make the existence of all the facts constituting the defense a reasonable hypothesis for the factfinder to entertain." *Doyon*, 1999 ME 185, ¶ 7, 745 A.2d at 367 (quoting *State v. Case*, 672 A.2d 586, 589 (Me.1996)). The "competing harms" defense, however, is not generated merely because a defendant subjectively believes that a threat of imminent physical harm to person or property exists. *State v. Caswell*, 2001 ME 23, ¶ 12, —— A.2d —— (citations omitted). Rather, the evidence must demonstrate "as a fact" that physical harm was imminently threatened. *Id.*

[¶ 11] In determining whether the facts at trial put a statutory justification at issue, the trial court must consider the evidence in the light most favorable to the defendant. *State v. Wilder*, 2000 ME 32, ¶ 23, 748 A.2d 444, 450 (citations omitted). The source of the evidence makes no difference; either side may introduce evidence which generates a justification. *Id.* Once a justification is placed at issue as a result of evidence presented at trial, "the state must disprove its existence beyond a reasonable doubt." *Id.* at ¶ 25, 748 A.2d at 451 (quotation omitted).

[¶ 12] Looking at the evidence in a light most favorable to Soule, the record shows that Soule—upon seeing Vogt levelling the gun on him—made a split-second decision to crash through the deck door in an attempt to disarm Vogt. The record evidence, therefore, is "sufficient to make the existence of all the facts constituting the [competing harms] defense a reasonable hypothesis for the factfinder to entertain." *See State v. Case*, 672 A.2d 586, 589 (Me.1996). Accordingly, the trial court's denial of the request for the "competing harms" instruction constituted a prejudi-

cial error. *See Doyon,* 1999 ME 185, ¶ 7, 745 A.2d at 367.

[¶ 13] Further, the jury—contrary to the State's contention—would not have been confused by the "competing harms" instruction. In fact, the jury appeared to have been confused by the lack of the instruction. During its deliberations, for example, the jury submitted two questions to the court, asking: (1) did Jeffrey Soule have a legal right to defend himself by breaking through a sliding glass door and attempting to take the gun from Mike Vogt; and (2) can an assailant use a claim of self defense to justify breaking into another's residence. In response, the trial court re-read the self-defense instruction.

[¶ 14] The substance of the questions the jury submitted and the fact that the jury acquitted Soule of the other charges indicate that a "competing harms" instruction was needed. The gist of the questions shows that the jury clearly understood that the self-defense instruction was limited to the assault charge and that the "competing harms" instruction would have clarified that there was a justification to consider for the trespass charge. In fact, the latter of the two questions suggest the jury was looking for a specific justification defense to apply to the aggravated criminal trespass charge and recognized that the self-defense instruction was inadequate for that purpose. The instruction, as given, therefore, was erroneous, having created the "possibility of jury confusion and a verdict based on impermissible criteria." *Day,* 1999 ME 29, ¶ 8, 724 A.2d at 1247. In this case, it was not highly probable that the erroneous instruction did not affect the verdict. *See id.*

The entry is:

Judgment vacated.