2008 ME 112

STATE of Maine

v.

Daniel P. ROBERTS.

Supreme Judicial Court of Maine.

Argued: May 15, 2008.
Decided: July 8, 2008.

Thomas S. Marjerison, Esq. (orally), Norman, Hanson & DeTroy, LLC, Portland, ME, for Daniel P. Roberts.

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Atty. Gen., William R. Stokes, Dep. Atty. Gen. (orally), Fernand R. Larochelle, Asst. Atty. Gen., Office of Attorney General, Augusta, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, and MEAD, JJ.

LEVY, J.

[¶ 1] Daniel P. Roberts appeals from a judgment of conviction entered in the Superior Court (Androscoggin County, *Wheeler, J.*) on a jury verdict finding him guilty of murder, 17–A M.R.S. § 201(1)(A) (2007). Roberts raises numerous contentions with regard to the admission or exclusion of evidence at trial, including that the court erred by: (1) admitting evidence of vandalism to the victim's and other person's vehicles; (2) admitting two photographs of the victim and her daughter; (3) admitting a protection from abuse affidavit filed by the victim in August 2005; and (4) excluding the testimony of two witnesses regarding statements made to each by another defense witness. Roberts also argues that the court's instructions to the jury were erroneous in various respects, and that statements in the State's rebuttal closing argument constituted prosecutorial misconduct. We address each of these contentions and, finding no error, affirm the judgment.

## I. BACKGROUND

[¶ 2] The record evidence, viewed in the light most favorable to the jury's verdict, reveals the following facts. Daniel Roberts and the victim, Melissa Mendoza, met in California in 2002 and began dating shortly thereafter. Later that year, Mendoza became pregnant and returned with Roberts to his home in Maine where the

two began living together. Mendoza gave birth to their daughter in Maine in May 2003. The couple's relationship was marked by conflict, with Mendoza moving in and out of Roberts's home on numerous occasions, and often traveling back and forth between Maine and California.

[¶ 3] In September 2003, the District Court (Lewiston, *Carlson, M.*) entered an order regarding parental rights and responsibilities with respect to the couple's daughter. The order provided for shared parental rights and responsibilities, with primary physical residence of the daughter split evenly between Mendoza and Roberts and alternating every six months, beginning with Mendoza. However, the parties did not generally abide by the order and the daughter lived almost exclusively with Mendoza until June 2005.

## A. Events in June and July 2005

[¶ 4] In June 2005, the couple separated for the last time and Roberts, pursuant to the September 2003 order, had primary physical residence of the daughter in Maine while Mendoza returned to California. Mendoza traveled to Maine in July 2005 and consulted with an attorney regarding her desire to obtain a modification of the September 2003 parental rights and responsibilities order. Prior to pursuing this modification, however, Mendoza returned to California with the daughter and apparently without Roberts's consent. While Mendoza was in Maine in July, someone slashed two tires on her rental car.

[¶ 5] Upon learning that Mendoza had taken the daughter to California in violation of the September 2003 order, Roberts sought emergency enforcement of the parental rights order in the District Court and traveled to California to try to find the daughter. Shortly thereafter, Mendoza turned the daughter over to police in California, and Roberts brought the daughter back to Maine. The order issued by the District Court pursuant to Roberts's motion for emergency enforcement provided that a hearing would be held on August 8, 2005, regarding visitation with the daughter.

## B. Events on August 8 and 9, 2005

[¶ 6] At the August 8 hearing, the court granted Mendoza supervised visitation with the daughter beginning at 1 P.M. that day and continuing until the next evening, as well as during the next three weekends. The court appointed Dawn Destrini as the visitation supervisor upon Mendoza's suggestion and Destrini's agreement, with visits to occur at Destrini's home where Mendoza would thereafter be staying. The court also scheduled a case management conference on a motion to modify filed by Mendoza for September 12, 2005.

[¶ 7] Upon leaving the hearing, Mendoza discovered that someone had smashed the windshield of her rental car with a rock. Although Destrini picked the daughter up at 1 P.M. for Mendoza's scheduled visitation that day, Mendoza did not arrive at Destrini's home until around 5 P.M., due at least in part to the vandalism to her rental car. At some point during that evening, Roberts learned that Mendoza had been late for her scheduled visit and insisted that the daughter be returned to him. Mendoza subsequently returned the daughter to Roberts, prior to the end of her scheduled visitation.

[¶ 8] On the morning of August 9, 2005, Destrini discovered that four tires on two of her vehicles had been slashed. As a result of this incident, as well as conversations between the Destrinis, Roberts, and Mendoza, Dawn Destrini informed the District Court that she would no longer serve as visitation supervisor for Mendoza. In

addition, Destrini informed Mendoza that she could no longer stay at Destrini's home, and Mendoza checked into a hotel. As a result of Destrini's decision not to continue as visitation supervisor, the court held a hearing on August 10 to revise its order with regard to Mendoza's visitation with the daughter.

## C. Events on August 10 through 14, 2005

[¶ 9] At the August 10 hearing, Mendoza stated that she did not know of anyone else in the area who could serve as supervisor for her and did not have a suitable place in which to hold visits because she was staying in a hotel. Roberts then proposed two individuals to serve as supervisors—Kim Teehan and Stacey Robitaille—and also proposed that the visits take place at his home, which he would vacate during Mendoza's visits. The court ultimately entered an amended order providing for Mendoza to have visitation according to the previous schedule, but supervised by Teehan and Robitaille and occurring at Roberts's home. The first visit pursuant to this order was to occur over the weekend, beginning at 11 A.M. on August 12 and continuing until 5 P.M. on August 14. During the hearing, Roberts was served with a temporary protection from abuse order obtained by Mendoza the previous day, which the court amended during the hearing on August 10 to reflect the just-entered visitation order.

[¶ 10] Mendoza's visit with the daughter occurred as scheduled from August 12 to August 14.

## D. Events on August 15, 2005

[¶ 11] During the evening of August 14 and the early morning hours of August 15, Mendoza and Roberts exchanged a number of heated phone calls, some of which Mendoza recorded. Sometime after 1 A.M. on August 15, Mendoza called Roberts ask-ing to come to Roberts's home. Roberts told Mendoza she could as long as she did not "pull anything stupid." Mendoza arrived at Roberts's home shortly thereafter, and entered the garage through a side pedestrian door. Roberts fatally shot Mendoza once in the back of the head. Roberts then called 911 and told the dispatcher that he had just shot Mendoza because she had arrived at his home armed with a gun that, he claimed, she had stolen from his home during her earlier visit and had threatened to "shoot the baby and me."

## E. Indictment and Trial

[¶ 12] On December 6, 2005, Roberts was charged by indictment with one count of murder, 17–A M.R.S. § 201(1)(A), for the death of Mendoza. He pleaded not guilty on December 8, 2005, and a jury trial was held from February 6 to February 27, 2007. At trial, Roberts did not deny that he had shot Mendoza. His theory was that the killing was justified based on his belief that Mendoza came to his home, armed with a loaded weapon, to kidnap their daughter or to kill him and the daughter.

[¶ 13] At trial, the State presented abundant evidence regarding the history of Roberts and Mendoza's relationship and the events leading to Mendoza's death. The State also presented evidence that Mendoza had a loving relationship with the daughter such that Roberts could not have thought Mendoza actually intended to harm their daughter on August 15. Finally, the State sought to establish, through lay and expert witness testimony, that Mendoza had not been armed with Roberts's gun when she arrived at Roberts's home that morning and Roberts could not have believed that Mendoza posed a threat to his or their daughter's life.

[¶ 14] Roberts's theory of the case was that he shot Mendoza in defense of his own life and his daughter's life, or to prevent Mendoza from kidnapping the daughter. To support this theory, Roberts called several witnesses to testify to Mendoza's past acts of violence and anger toward Roberts and toward women who Mendoza believed Roberts was romantically involved with, all for the purpose of showing Roberts's state of mind at the time of the shooting. In addition, Roberts called witnesses to testify that Mendoza had told them of her plans to take the daughter to California or to hide with her in Kentucky. Roberts also sought to establish that Mendoza had stolen a loaded gun from his home during her weekend visit with the daughter and that she had this gun with her when she arrived at his home on August 15.

[¶ 15] At the close of all the evidence, counsel for both sides gave closing arguments. Roberts's closing focused on the theory that Mendoza came to Roberts's home with a loaded gun either to kill Roberts and the daughter or to kidnap the daughter. In its rebuttal argument, the State argued that the kidnapping theory was a new story developed by the defense for trial. Specifically, the State pointed to the fact that Roberts had consistently maintained, in his 911 call, his interview with police, and at a subsequent child protective hearing—all of which the jury heard at trial—that Mendoza had stated that she was going to kill him and the daughter, but he never stated that he thought Mendoza was going to kidnap the daughter.

## F. Jury Instructions and Verdict

[¶ 16] Prior to instructing the jury, the court engaged in extensive discussions regarding instructions with counsel. Although the State agreed that Roberts was entitled to an instruction on the use of deadly force in defense of self and others pursuant to 17–A M.R.S. § 108(2)(A) (2007),[1] it contended that the jury should not be instructed that Roberts could be justified in using deadly force to prevent a kidnapping for two reasons: (1) the evidence did not generate the instruction because following the shooting Roberts had only stated that he thought Mendoza was going to kill the daughter and him, but had never mentioned kidnapping; and (2) Mendoza, as the daughter's mother, was legally incapable of committing a kidnapping pursuant to Maine's kidnapping statute, 17–A M.R.S. § 301(2–B)(2007).[2]

---

1. Title 17–A M.R.S. § 108(2)(A) (2007) provides:

 2. A person is justified in using deadly force upon another person:
 A. When the person reasonably believes it necessary and reasonably believes such other person is:
 (1) About to use unlawful, deadly force against the person or a 3rd person; or
 (2) Committing or about to commit a kidnapping, robbery or a violation of section 253, subsection 1, paragraph A, against the person or a 3rd person.

2. Title 17–A M.R.S. § 301 (2007) provides, in pertinent part:

 1. A person is guilty of kidnapping if either:

 A. The actor knowingly restrains another person with the intent to:
 (1) Hold the other person for ransom or reward;
 (2) Use the other person as a shield or hostage;
 (3) Inflict bodily injury upon the other person or subject the other person to conduct defined as criminal in chapter 11;
 (4) Terrorize the other person or a 3rd person;
 (5) Facilitate the commission of another crime by any person or flight thereafter; or
 (6) Interfere with the performance of any governmental or political function; or
 B. The actor knowingly restrains another person:

[¶ 17] Ultimately, the jury was instructed on the elements of knowing and intentional murder, 17–A M.R.S. § 201(1)(A); the elements of kidnapping pursuant to 17–A M.R.S. § 301(1), (2) (2007); and the elements of criminal restraint by a parent, 17–A M.R.S. § 303(1)(A), (B) (2007). The jury was also instructed that "it is a defense to a prosecution for the crime of kidnapping that the person restrained is the child of the actor." The court also instructed the jury with regard to the defense of self and others justification as follows:

> A person is justified in using deadly force upon another person when the person actually believes it is necessary and believes such other person is about to use unlawful deadly force against him or against a third person, or committing or about to commit a kidnapping, robbery, or gross sexual assault against the person or a third person. . . .

> Because the evidence in this case generates an issue of whether the defendant acted in self-defense or in defense of [the daughter], to support a murder conviction the state must prove beyond a reasonable doubt that, (a) with the purpose to cause physical harm to another person the defendant provoked the encounter, or (b) the defendant [did not believe] that the deceased was . . . about to use deadly force against him and [the daughter] and the defendant did not believe that the deceased was about to kidnap [the daughter], or (c) the defendant did not believe that his use of deadly force was necessary to defend himself and [the daughter].

> **(1)** Under circumstances which in fact expose the other person to risk of serious bodily injury; or
> **(2)** By *secreting* and holding the other person in a place where the other person is not likely to be found.

[¶ 18] The jury returned a verdict of guilty and the court subsequently sentenced Roberts to a term of fifty-five years imprisonment. This appeal followed.

## II. DISCUSSION

[¶ 19] We address, in order, Roberts's claims of error associated with: (A) the admission or exclusion of evidence; (B) the jury instructions; and (C) the alleged prosecutorial misconduct in the State's rebuttal closing argument.

### A. Claimed Errors in the Admission or Exclusion of Evidence

[¶ 20] Roberts raises several arguments with respect to the trial court's admission or exclusion of certain evidence. Under the rules of evidence, "[a]ll relevant evidence is admissible." M.R. Evid. 402. "All facts which tend to prove or disprove the matter at issue or which constitute a link in the chain of circumstantial evidence with respect to the act charged are relevant and should be admissible into evidence within judicial discretion unless excluded by some rule or principle of law." *State v. Allen*, 2006 ME 20, ¶ 18, 892 A.2d 447, 453 (quotation marks omitted). Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice." M.R. Evid. 403.

[¶ 21] Where a party has preserved an objection admitting or excluding evidence, this Court reviews the trial court's determination regarding relevance for clear error, *State v. Buchanan*, 2007 ME 58, ¶ 8, 921 A.2d 159, 162, and its weighing of the probative value of evidence

. . . .
**2–B.** It is a defense to a prosecution under this section that the person restrained is the child of the actor.

against the risk of unfair prejudice for an abuse of discretion, *State v. Hamel*, 2007 ME 18, ¶ 6, 913 A.2d 1287, 1289. Where the claimed error is unpreserved, we review the trial court's decision under an obvious error standard, requiring "either a determination or an assumption that an error was made, and then a determination as to whether the error was obvious and affected substantial rights." *State v. Snow*, 2007 ME 26, ¶ 11, 916 A.2d 957, 961 (quotation marks omitted). "An unpreserved error is obvious when it deprives a party of a fair trial or results in such a serious injustice that the Court cannot, in good conscience, allow the judgment to stand." *Id.*

[¶ 22] Roberts contends that the court erred with respect to: (1) the admission of evidence regarding vandalism to Mendoza's and Destrini's vehicles; (2) the admission of photographs of Mendoza and the daughter; (3) the admission of a protection from abuse affidavit filed by Mendoza on August 8, 2005; and (4) the exclusion of the testimony of two witnesses regarding statements made to each by another defense witness. We examine each of these contentions in turn.

### 1. Evidence of Vandalism

[¶ 23] Although the State did not contend that Roberts personally committed the vandalism to the cars that preceded the murder, the State called two witnesses to testify to their observations of a person, admittedly not Roberts, slashing Mendoza's tires on July 1, 2005; a police officer to testify to the incident on August 8, 2005, in which Mendoza's windshield was smashed; and Dawn Destrini to testify regarding the slashing of the tires on her vehicles on August 9, 2005. None of the witnesses identified the perpetrator or perpetrators of these acts.

[¶ 24] Prior to the State's first witness, Roberts objected to the admission of any testimony regarding the vandalism. Roberts argued that the jury would impermissibly attribute these acts to him despite the lack of evidence linking him to the vandalism and would therefore use the testimony as improper character evidence prohibited by M.R. Evid. 404(b).[3] The State argued that the testimony should be admitted to explain the sequence of events leading to Mendoza having visits with the daughter at Roberts's home, and to respond to Roberts's portrayal of Mendoza in his opening statement as paranoid and out of control. The court ultimately allowed the testimony, finding that the probative value of the vandalism evidence was to explain Mendoza's conduct and the sequence of events leading to Mendoza's death, which outweighed any danger that the acts would be improperly attributed to Roberts. The court specifically ruled that the State could not attribute the vandalism to Roberts as prior bad acts.

[¶ 25] We conclude that the court's decision to admit this evidence was within the proper bounds of the discretion afforded by M.R. Evid. 403.[4] First, as the trial court reasoned, the vandalism evidence explained, "from [Mendoza's] point of view, why she's taking certain steps,

---

**3.** Maine Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith."

**4.** Maine Rule of Evidence 403 provides that, "[a]lthough relevant, evidence may be exclud-ed if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

why she misses the visitation, why it's late, . . . [and] why visitation is changed from the Destrinis' [house] to his house." Second, the State did not assert that Roberts committed the acts of vandalism, and Roberts elicited testimony on cross-examination to establish that he had not committed these acts. In its ruling on the admission of the evidence, the trial court was explicit "that none of it can be used to show prior bad acts on the part of Mr. Roberts." Accordingly, the evidence does not fall under M.R. Evid. 404(b)'s proscription against bad character evidence. Finally, although an instruction limiting the jury's use of this evidence for the purpose of understanding the sequence of events surrounding Mendoza's death may have been appropriate, none was requested. *See State v. Cloutier*, 1997 ME 96, ¶ 14, 695 A.2d 550, 555.

[¶ 26] Under the circumstances, the court's application of M.R. Evid. 403 and its decision to admit the vandalism evidence to explain Mendoza's conduct and to establish the circumstances giving rise to Mendoza's appearance at Roberts's residence during the early morning hours of August 15, 2005, was not an abuse of discretion.

2. Photographs of Mendoza and the Daughter

[¶ 27] Roberts argues that the court erred in admitting, over his objection, two photographs of Mendoza and their daughter in which they are kissing and smiling. The photographs were initially shown to witnesses by the State only for identification purposes. However, after Roberts played a recording of his 911 call to the jury, the State argued that the photographs should be admitted into evidence to rebut Roberts's statements in this recording that Mendoza had threatened to kill the daughter. Roberts argues that the

photographs were irrelevant to the issues at trial and were unfairly prejudicial because they were likely to elicit an improper emotional response from the jury.

[¶ 28] We have previously provided that "photographs are admissible if they are (1) accurate depictions; (2) relevant; and (3) if their probative value is not outweighed by any tendency toward unfair prejudice." *State v. Allen*, 2006 ME 21, ¶ 10, 892 A.2d 456, 459. A photograph may be unfairly prejudicial when it "has an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one." *Id.* ¶ 13, 892 A.2d at 460 (quotation marks omitted).

[¶ 29] The first two criteria are easily met. Roberts concedes that the photographs are an accurate depiction of Mendoza and their daughter. With regard to relevance, the State argues that it offered the photographs—which depict the mother and child as having a loving relationship—to rebut Roberts's claim that he believed Mendoza was going to kill their daughter. Roberts's belief on this point was relevant at trial because of his theory of the case, and accordingly we discern no error in the trial court's conclusion that the photographs tended to establish a consequential fact. *See* M.R. Evid. 401.

[¶ 30] With respect to the third criterion, although the photographs were of such a nature as to possibly evoke an emotional response by the jury, we find no abuse of discretion in the court's conclusion that the probative value of the photographs outweighed any danger of unfair prejudice. There was other evidence admitted at trial establishing the caring relationship between Mendoza and the daughter, including Destrini's testimony that Mendoza was very good to the daughter and they were happy together and a recording of the daughter upset and crying when Mendoza

left her on August 14 after their visit. Because of the cumulative nature of the evidence of Mendoza and the daughter's relationship, most of which Roberts did not object to, it is unlikely that the photographs moved the jury to decide the case on an emotional basis.

### 3. The August 2005 Protection From Abuse Affidavit

 [¶ 31] During the trial, the jury heard testimony that Mendoza had filed a number of protection from abuse complaints against Roberts during their relationship, including a video recording of Roberts's testimony from a child protective hearing regarding these complaints. Roberts offered, and the court admitted, a protection from abuse complaint and related paperwork filed by Mendoza in June 2005 against Roberts.[5] Included in this exhibit was Mendoza's affidavit in support of the complaint alleging that Roberts had "hit me, kicked me, punched me, strangled me and put a gun to my head." The State then offered, and the court admitted without objection, Mendoza's complaint for protection from abuse and supporting affidavit filed in August 2005. The affidavit contained allegations that Roberts had "put a gun to [Mendoza's] head numerous times" and that she was afraid he or one of his friends would hurt her.

[¶ 32] The complaints and affidavits were admitted after a conference with the court in which Roberts argued that because the protection from abuse com-

plaints had been referred to in testimony, the June 2005 complaint and related proceedings should be admitted as an exhibit. The State argued that, in the interest of "completeness," the August 2005 complaint should also be admitted. Roberts agreed to the admission of the August complaint and related paperwork, and the court subsequently admitted both complaints and related paperwork.[6]

[¶ 33] With respect to the protection from abuse complaints and affidavits, the court instructed the jury:

> [T]he allegations [in the complaints and affidavits] are not evidence of anything. It is simply—again, those are simply to indicate that she did file a complaint for protection from abuse, and you put on whatever weight you choose as ... the finders of fact to place on that. But you cannot consider the allegations that appear in the 2005 complaint as evidence of anything. They're simply allegations. They've never been proven and they have no ... evidentiary concern. They're not to be considered by you when you assess the evidence.

Although he did not object at trial, Roberts now contends that the court committed obvious error in admitting Mendoza's August 2005 protection from abuse affidavit because it violated his Sixth Amendment Confrontation Clause rights and contained allegations so prejudicial as to constitute manifest injustice.

---

5. Attached to this exhibit was (1) Mendoza's affidavit alleging physical abuse by Roberts; (2) a temporary protection from abuse order signed on June 14, 2005; (3) a motion to dismiss the temporary order and an affidavit filed by Mendoza on June 16, 2005, stating that she no longer wished to proceed with the complaint; (4) an order dismissing Mendoza's complaint; and (5) a motion to vacate the dismissal of the June 14 complaint filed by Mendoza on August 9, 2005.

6. The court also admitted complaints for protection from abuse filed by Mendoza against Roberts in 2003 and 2004 offered by the State for the purpose of providing the jury with a complete picture of the protection from abuse proceedings throughout the relationship. Roberts does not object to the admission of these complaints on appeal.

[¶ 34] Contrary to Roberts's contention, admission of the August protection from abuse affidavit did not implicate Roberts's Confrontation Clause rights because Mendoza's statements contained therein were not offered for their truth. In *Crawford v. Washington*, 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the U.S. Supreme Court explained that "[t]he [Confrontation] Clause ... does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." The trial court's instruction to the jury establishes that the affidavit was not admitted for the truth of the matters asserted in it.

[¶ 35] Nor can we conclude that admission of the protection from abuse affidavit was so prejudicial as to constitute error, much less obvious error, under the facts of this case. Roberts himself introduced, as an exhibit, the protection from abuse affidavit filed in June 2005 that contained allegations similar to those contained in the August affidavit, along with subsequent documents filed by Mendoza indicating that she no longer wished to proceed with the complaint. The State therefore sought admission of the August complaint and affidavit to give the jury a complete picture of the history of the protection from abuse proceedings between Mendoza and Roberts throughout their relationship. Because the jury was instructed that it was not to consider the allegations for their truth, and because the affidavit was offered for reasons other than showing Roberts's alleged bad character, we find no obvious error in the admission of the August 2005 protection from abuse affidavit.

4. Exclusion of Defense Witness Testimony

[¶ 36] Roberts called Jaime Bolduc, a friend of Roberts's family for almost twenty years, who testified that Mendoza had stated shortly before her death that if Mendoza had a gun, she would shoot Roberts. Bolduc testified that she did not initially tell police of this statement because she felt she would have been betraying her friendship with Mendoza, but did eventually inform police of the statement in November 2005.

[¶ 37] In its cross-examination of Bolduc, the State sought to raise the inference that Bolduc had fabricated Mendoza's statement to protect Roberts from being arrested and prosecuted for murder. In an effort to rebut the State's charge of fabrication, Roberts sought to elicit the testimony of Michelle Booth and Jeri Wade that Bolduc had repeated the statement to both witnesses prior to her interview with police in November 2005, but after Mendoza's death. The State objected, arguing that Bolduc's motive to fabricate the statement arose at the time of Mendoza's death, and that her statements to both witnesses were therefore inadmissible pursuant to M.R. Evid. 801(d)(1). The court agreed, excluding the testimony.

[¶ 38] Maine Rule of Evidence 801(d)(1) provides that "[a] prior consistent statement by the declarant, whether or not under oath, is admissible only to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." The proponent of such a prior consistent statement "has the burden of establishing that the statement was (1) consistent with the in-court statement of the witness, (2) offered to rebut an express or implied charge of recent fabrication or improper influence, and (3) made prior to the time the supposed motive to falsify arose." *State v. Weisbrode*, 653 A.2d 411, 415 (Me.1995). The trial court is accorded discretion in its determination of when the motive to fabricate arose. *Id.*

[¶ 39] In the present case, the court found that Roberts failed to establish that Bolduc's motive to fabricate Mendoza's statement—her desire to protect Roberts—arose at any time other than at "the time of the shooting." This finding is not clearly erroneous as Bolduc herself testified that she had been a friend of Roberts's family for almost twenty years and had only recently become close to Mendoza at the time of Mendoza's death. Because the court found that Bolduc's statements to both Booth and Wade occurred *after* the motive to falsify arose, the statements do not qualify as prior consistent statements under Rule 801(d)(1). Accordingly, we find no error in the court's exclusion of Booth's and Wade's testimony.

### B. Claimed Errors in Jury Instructions

[¶ 40] Roberts contends that the court's instruction on defense of self and others constituted obvious error because it lowered the mens rea element of knowing or intentional applicable to murder. Roberts argues that the court should have instructed the jury that the State had to prove that Roberts *knew* Mendoza was not about to use deadly force and knew that she was not about to kidnap the daughter rather than that Roberts *did not believe* Mendoza was about to commit these acts.

[¶ 41] "We review jury instructions as a whole for prejudicial error, to ensure they informed the jury correctly and fairly." *State v. Gauthier,* 2007 ME 156, ¶ 14, 939 A.2d 77, 81. In conducting this review, "we consider the effect of the instructions as a whole and the potential for juror misunderstanding." *Id.*

[¶ 42] A defendant cannot be convicted of murder unless he committed the act "[i]ntentionally or knowingly." 17–A M.R.S. § 201(1)(A). Accordingly, a court's justification instruction in a trial for murder must not allow the State to overcome the defense "simply [by] negating the reasonableness of a belief, or even [by] demonstrating that a belief was reckless." Alexander, *Maine Jury Instruction Manual* § 6–55 at 6–76 (4th ed.2008); *see also State v. Forbes,* 2003 ME 106, ¶ 18, 830 A.2d 417, 422.

[¶ 43] Viewing the jury instructions given by the court in this case in their entirety, the court's justification instruction did not impermissibly lower the applicable mens rea for murder from "knowing" to "reasonable belief."[7] The court instructed the jury that "[a] person is justified in using deadly force upon another person when the person *actually believes* it is necessary and believes such other person is about to use unlawful deadly force against him or against a third person." In addition, the court emphasized that the jury was to consider Roberts's state of mind at the time of the shooting in order to make this determination. Accordingly, the jury was asked to evaluate Roberts's actual belief at the time of the shooting, and was not permitted to find that the State had met its burden of disproving Roberts's justification defense if it established only that Roberts's beliefs were unreasonable or reckless.[8]

7. The court instructed the jury that a "person causes death knowingly if he is aware that it is practically certain that his conduct will cause death. And a person acts knowingly with respect to attendant circumstances when he is aware that such circumstances exist." Roberts and the State agreed that the jury would not be instructed on the lesser-included offense of manslaughter or on an imperfect justification defense. Accordingly, the jury was not instructed on the objective reasonableness of Roberts's use of deadly force.

8. Roberts also raises a number of other contentions with respect to the jury instructions in this case. Because the instructions were

## C. Prosecutorial Misconduct

[¶ 44] Roberts's closing argument focused on his theory that he was justified in shooting Mendoza because he believed that she was going to kill him and their daughter or was going to kidnap the daughter. The State argued in rebuttal:

Well, so now you hear the new twist, the new invention. Did you pick up on it? First it was, She's coming to kill the baby and then me. Right? Now it's, Well, you know, maybe he thought that she was coming to kidnap the baby, because he knows there is no way you're going to believe that Melissa Mendoza would go there to shoot her baby in her bed; so now they've got to come up with a new story.

In support, the State pointed to the fact that Roberts never stated in his 911 call, his interview with police, or at the child protective hearing, that he shot Mendoza because he thought she was going to kidnap the daughter. Roberts contends that these statements constituted prosecutorial misconduct because they impermissibly referred to Roberts's decision not to testify at trial and constitute an implicit accusation that defense counsel was lying.

[¶ 45] A criminal defendant has an absolute right not to be a witness in his own trial pursuant to the Fifth Amendment to the U.S. Constitution and article I, section 6 of the Maine Constitution. To protect this right, a prosecutor may not comment on the accused's silence. *See State v. Tibbetts*, 299 A.2d 883, 887 (Me. 1973). Even ambiguous or equivocal state-ments to this effect can run afoul of the prohibition. *Id.* at 888. In determining whether a prosecutor's statement consti-tutes misconduct, "[t]he central question is whether the prosecutor's comment is fairly based on the facts in evidence." *State v. Lockhart*, 2003 ME 108, ¶ 48, 830 A.2d 433, 449 (quotation marks and alteration omit-ted).

[¶ 46] Initially we note that Rob-erts did not raise any objection to the State's rebuttal closing argument until the day after it was given, and even then did not argue that the statements constituted a comment on Roberts's decision not to testify at trial. Under these circum-stances, we evaluate any error, if present, under the obvious error standard. *See State v. Clarke*, 1999 ME 141, ¶ 23, 738 A.2d 1233, 1237.

[¶ 47] Our examination of the state-ments of which Roberts now complains, however, reveals no error under the facts of this case. It is clear that the State's argument was a proper comment on the evidence as presented to the jury at trial: The prosecutor quoted Roberts's state-ments from his interview with police and from the child protective hearing that he believed Mendoza was going to kill him and the daughter, and emphasized the fact that Roberts never stated following the shooting that he thought Mendoza was going to kidnap the daughter. Because Roberts's actual belief was all that was relevant to the jury's assessment of Rob-erts's justification defense, the State's re-

---

generated by the evidence and closely tracked the language of the applicable statutes, we do not separately address these contentions and find no error in the instructions as given. *See State v. Mann*, 2005 ME 25, ¶ 13, 868 A.2d 183, 187 ("When jury instructions closely par-allel the provisions of the Maine Criminal Code, they are adequate to provide the jury with the necessary information."); *State v.*

*Soule*, 2001 ME 42, ¶ 10, 767 A.2d 316, 319 (providing that a defendant is entitled to an instruction on a statutory defense "when he can point to the existence of evidence suffi-cient to make the existence of all the facts constituting the defense a reasonable hypothe-sis for the factfinder to entertain" (quotation marks omitted)).

buttal argument properly highlighted its view that the evidence did not support a finding by the jury that Roberts actually believed Mendoza was going to kidnap the daughter. The State did not implicate Roberts's Fifth Amendment rights nor commit prosecutorial misconduct in so arguing.

The entry is:

Judgment affirmed.