2010 ME 57

**STATE of Maine**

v.

**Joseph DUMAS.**

Supreme Judicial Court of Maine.

Argued: May 19, 2010.

Decided: June 29, 2010.

Peter J. Cyr, Esq. (orally), Law Offices of Peter J. Cyr, Portland, ME, Richard Hartley, Esq., Law Office of Richard Hartley, Bangor, ME, for Joseph Dumas.

Janet T. Mills, Attorney General, Andrew B. Benson, Asst. Atty. Gen., Donald W. Macomber, Asst. Atty. Gen. (orally), Augusta, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and LEVY, SILVER, MEAD, and GORMAN, JJ.

MEAD, J.

[¶ 1] Joseph Dumas appeals from a judgment of conviction entered by the Superior Court (Penobscot County, *Murphy, J.*) on a jury verdict finding him guilty of murder, 17–A M.R.S. § 201(1)(A) (2009).[1] Dumas contends that the court (1) erred in denying two motions to suppress, one concerning personal property taken by police at the hospital where he was being treated following a motor vehicle accident and the other concerning statements he made to police at the hospital and later at his home; (2) abused its discretion in denying his motion for a mistrial after a psychiatrist called by the State testified that "people that murder other people" frequently forget what happened; and (3) erred in instructing the jury that the requisite intent to cause death "may be formed in the instant before the death-producing con-

duct." Finding no error, we affirm the judgment.

## I. BACKGROUND

[¶ 2] The following facts are supported by the evidence admitted at trial when viewed in the light most favorable to the State, *see State v. Townsend,* 2009 ME 106, ¶ 10, 982 A.2d 345, 346–47, and by the findings of the Superior Court following the hearing on Dumas's motions to suppress, which have support in the record and therefore are not clearly erroneous, *see State v. Bailey,* 2010 ME 15, ¶ 16, 989 A.2d 716, 721.

[¶ 3] At about 9:00 a.m. on November 9, 2007, a pickup truck driven by Joseph Dumas crossed the centerline on Route 2 in Lincoln and struck a tractor-trailer. Dumas was taken by ambulance to Penobscot Valley Hospital, where x-rays were taken by a technician. Dumas was upset and told the technician that he did not think he would ever see his wife again. When she asked him why, he said it was because he had killed someone; she understood him to mean it had happened that day. The police were summoned while Dumas's treatment continued. A blood sample drawn from Dumas indicated recent cocaine use.

[¶ 4] While removing some of Dumas's clothing in preparation for his x-rays, the technician discovered a knife and some .22–caliber ammunition. After Dumas told her that he had killed someone, the technician turned over his pants, the knife, a set of keys, and the ammunition to police. No officer had asked her for the items; it was her decision to turn them over.

[¶ 5] Detective Darryl Peary of the Maine State Police was one of the officers

---

1. The statute provides:

   1. A person is guilty of murder if the person:

   A. Intentionally or knowingly causes the death of another human being.

   17–A M.R.S. § 201(1)(A) (2009).

who went to the hospital to investigate Dumas's statement to the technician. He made two attempts to interview Dumas; both were recorded. In the first attempt at about 4:00 p.m., Peary, wearing civilian clothes, entered Dumas's room where his daughter was also present. As soon as Peary identified himself, Dumas said that he wanted a lawyer. A conversation followed concerning why he thought that was necessary, and Dumas made some statements about drinking and doing drugs before the accident, which he said was his fault. Dumas seemed oriented, responded appropriately, and did not appear to be intoxicated; he was told that he was not under arrest and that he did not have to talk to Peary. Peary explained that he was not there to talk about the accident, but rather the statements Dumas had made to the technician. Dumas was not restrained or threatened during the conversation, which lasted five to six minutes.

[¶ 6] Within a half-hour Peary made a second attempt to interview Dumas; this time the conversation lasted about one minute. Peary told Dumas that he was not there to question him, but wanted to know if he could help locate Sonny Litterio, who was Dumas's good friend. Litterio's whereabouts were a matter of interest after Peary had spoken to Dumas's wife earlier. Dumas asked Peary if he had checked Litterio's address, then said he did not wish to speak further. Peary left the room and soon left the hospital. Shortly thereafter, at about 6:00 p.m., Dumas was discharged from the hospital and left in a vehicle driven by his daughter. Peary followed them at a distance until Dumas arrived at his home, then left the area to go to Litterio's residence, where he and other officers continued to investigate.

[¶ 7] Just after 9:00 p.m., Peary took a call from Dumas, who "indicated he was at his residence and had his family there, and he was ready to sit down and talk to us."

Peary had made no attempt to contact Dumas since he had left the hospital. Peary and another detective arrived at Dumas's residence a few minutes later and conducted a taped interview at his kitchen table, preceded by *Miranda* warnings and a lengthy waiver discussion. During the interview of just over an hour, Dumas did not appear to be intoxicated, was not restrained or threatened, and was not told that he was under arrest. As he spoke to the detectives, Dumas's family remained upstairs in the residence.

[¶ 8] Dumas told the detectives that the previous day he had bought an "8 ball" of cocaine, ingested it, and was "out of my mind." While working at a camp he saw a buck on a skidder trail and shot at it with his black powder rifle. Believing he had hit the deer, he went to get his friend Sonny Litterio, whom he knew owned a gun, to help him dispatch it. Litterio got in his truck and went with Dumas to the skidder trail. Dumas said that when Litterio handed him his .38–caliber revolver, "I don't know what happened after that, all I know is I shot him. I know that. I don't know why, or what was going on in my head." At trial, the Chief Medical Examiner testified that Litterio had been shot twice in the shoulder and three times in the head. In his opening statement Dumas's counsel told the jury that Dumas had shot Litterio five times, with the final shot coming from his .50–caliber black powder rifle.

[¶ 9] After the interview concluded, the detectives retrieved Litterio's wallet and gun from the camp where Dumas said they would be. The next morning officers located Litterio's body using a map Dumas had drawn for them. At about 4:00 p.m., Peary returned to Dumas's home with two other detectives to re-interview him. Once again the detectives sat at the kitchen table and read Dumas his *Miranda* warn-

ings; Dumas again agreed to answer their questions and in a recorded interview again confessed to shooting Litterio. Dumas was arrested following the interview.

[¶ 10] In December 2007, the Penobscot County Grand Jury returned an indictment charging Dumas with murder, 17–A M.R.S. § 201(1)(A). In March 2008, Dumas filed motions to suppress the items received by police at the hospital, and all statements he had made to Peary, both at the hospital and in the two interviews at his home. Following a hearing, the court denied both motions, finding that (1) the technician was not a state actor and had acted on her own in turning over Dumas's property to officers; and (2) all of Dumas's statements were made either when he was not in custody or following an effective waiver of his Fifth Amendment rights.

[¶ 11] At trial, Dumas's attorneys readily conceded that he shot Litterio and that he was guilty of manslaughter,[2] but argued that the cocaine he ingested produced a psychosis that left him unable to act intentionally or knowingly, and that he was therefore not guilty of murder. The jury returned a verdict of guilty. At a sentencing hearing, the court entered judgment and sentenced Dumas to thirty years' imprisonment and ordered him to pay $4500 in restitution. This appeal followed.

## II. DISCUSSION

A. Motions to Suppress

■ [¶ 12] When a defendant challenges the denial of a motion to suppress, we review the trial court's factual findings for clear error and its "application of those facts to constitutional protections ... de novo." *Bailey*, 2010 ME 15, ¶ 16, 989 A.2d at 721 (quotation marks omitted).

2. Dumas did not testify at trial.

1. Property Taken at the Hospital

■ [¶ 13] Dumas asserts that an unconstitutional seizure occurred when a police officer accepted the items brought from his room by the technician. The motion court rejected that argument after finding that the technician acted of her own volition and was not a state actor. *See State v. LeGassey*, 456 A.2d 366, 367 (Me.1983) ("The fourth amendment is a limitation on government action only...."). Because the State did not seek to admit any of the contested physical evidence at trial, the point is moot and we will not consider it on appeal. *Sorayl v. Sordyl*, 1997 ME 87, ¶ 4, 692 A.2d 1386, 1387 ("We review only those cases that present a justiciable controversy. If issues become moot, an appeal is nonjusticiable." (citation omitted)).

2. Statements at the Hospital

■ [¶ 14] Dumas contends that after Detective Peary initially identified himself at the hospital and he told Peary that he wanted a lawyer, all subsequent answers he gave in response to police questions must be suppressed, including the interviews at his home that evening and the next day. The court concluded that Dumas was not in custody when he was briefly questioned at the hospital, and therefore *Miranda* warnings were not required. *See State v. Poblete*, 2010 ME 37, ¶ 21, 993 A.2d 1104, 1109 (stating that a defendant's pre-*Miranda* statements are admissible if he was not in custody). Again, any error in declining to suppress the hospital statements is not cognizable on appeal because the State did not seek to admit them at trial. *See Sordyl*, 1997 ME 87, ¶ 4, 692 A.2d at 1387.

### 3. First In–Home Interview

[¶ 15] Unlike the statements he made at the hospital, statements Dumas made during the first interview conducted at his home were offered at trial. The court declined to suppress them for two reasons—first that he was not in custody, and second that he waived his Fifth Amendment rights following effective *Miranda* warnings. The non-custodial finding is well supported by the court's factual findings that (1) Dumas initiated the interview by calling police some three hours after he left the hospital; (2) the interviews were conducted at his home with his family present; and (3) nothing in the officers' manner would have conveyed to a reasonable person that he could not simply terminate the interview and ask the officers to leave. *See Poblete,* 2010 ME 37, ¶ 22, 993 A.2d at 1109 (stating that "the ultimate inquiry" in custody determination is whether a reasonable person would have felt at liberty to terminate the interrogation or whether there is a restraint on freedom of movement equivalent to formal arrest).

[¶ 16] The record also supports the court's finding that Detective Peary administered complete *Miranda* warnings, going so far as to have Dumas explain what he understood each part to mean before asking him if he wished to waive his rights. As the court noted, at several points during the administration of the *Miranda* warnings Peary had to forestall Dumas's attempts to confess before the warnings were fully completed.

### 4. Second In–Home Interview

[¶ 17] Although the second interview, conducted the following day, also took place at Dumas's home under circumstances much like the first, the trial court found that he was in custody because he knew that he would soon be arrested and therefore knew that he was not free to leave. As with the first interview, however, the court found that Dumas's answers to police questions were preceded by effective *Miranda* warnings and a waiver of his Fifth Amendment rights. That finding is well supported by the record, as the interview began with Peary reading each paragraph of the *Miranda* warnings one at a time, followed by Dumas explaining his understanding of what each meant. After the warnings were finished, Dumas said that he wanted to answer Peary's questions, which he did without any evident hesitation. Accordingly, there was no error in declining to suppress Dumas's statements made during this interview. *See State v. Dominique,* 2008 ME 180, ¶ 9, 960 A.2d 1160, 1162–63 (stating that a person subject to custodial interrogation must be advised of the rights referred to in the *Miranda* warnings for his statements to be admissible at trial).

### B. Motion for Mistrial

[¶ 18] During the direct examination of a psychiatrist called by the State at trial, the following exchange occurred concerning Dumas's statement to police that he did not remember the actual shooting:

STATE'S ATTORNEY: All right. Is there any sort of test you can administer to determine whether he does or does not remember the shooting?

A: Not particularly that one event.

Q: Okay. So, are the possibilities he doesn't remember? That's one possibility?

A: Mm-hmm.

Q: What are the other possibilities?

A: Um—that he—frequently, with people that murder other people, they—um—they—they forget. They have what they call blackouts.

[¶ 19] Dumas promptly objected to the implication that he was like "people that

murder other people," asked that the testimony be stricken, and requested a curative instruction. The court agreed and instructed the jury:

> Ladies and gentlemen, as you know, there was an objection to an answer from the witness. And to the extent that the witness suggested that Mr. Dumas may be like other persons who commit murder, I am ordering you to disregard that comment, and it is stricken from the record. It—it is an improper comment in that it suggests that it is within the province of an expert witness to make that decision whether or not Mr. Dumas is guilty of the offense of murder. In fact, that is your job, as jurors, to decide whether or not he fits the statutory criteria in Maine for that offense. So that remark is stricken from the record.

[¶ 20] The psychiatrist's testimony then resumed. After several more questions and answers, Dumas's counsel went to sidebar and requested a mistrial. The court denied the motion, ruling that the curative instruction was sufficient to address Dumas's objection. Dumas now asserts that the court's failure to order a mistrial requires us to vacate his conviction.

[¶ 21] As a rule, "when a witness testifies to inadmissible evidence, a defendant is only entitled to a curative jury instruction, not a mistrial. A curative instruction usually preserves a fair trial unless there are exceptionally prejudicial circumstances or prosecutorial bad faith." *State v. Winslow*, 2007 ME 124, ¶ 19, 930 A.2d 1080, 1085 (citation omitted) (quotation marks omitted). A mistrial should only be granted "in the rare circumstance that the trial is unable to continue with a fair result and only a new trial will satisfy the interests of justice." *Poblete*, 2010 ME 37, ¶ 26, 993 A.2d at 1110 (quotation marks omitted). Recognizing "the trial court's

superior vantage point, [w]e review the denial of a motion for mistrial for an abuse of discretion." *Id.* (quotation marks omitted).

[¶ 22] Here there is no evidence of prosecutorial bad faith, nor does Dumas claim any. The question posed by the prosecutor asked the psychiatrist why Dumas might report a faulty memory of the shooting; it did not invite a comparison of Dumas with "people who murder other people." Nor is there evidence of exceptionally prejudicial circumstances—the court promptly gave a carefully worded curative instruction and struck the offending non-responsive answer as Dumas initially requested, and the State moved on. The jury is presumed to follow the court's instructions. *State v. Bennett*, 658 A.2d 1058, 1063 (Me.1995). On whole, the record reveals no abuse of discretion in declining to declare a mistrial.

## C. Jury Instructions

[¶ 23] Finally, Dumas challenges the court's jury instruction concerning intentional conduct:

> In order to establish that his conduct was intentional, the State does not have to prove that he acted with premeditation, that is, with planning or deliberation. Rather, the intent to cause death may be formed in the instant before the death-producing conduct. However, you may consider any evidence of premeditation, if you find it exists, as it bears upon whether or not Mr. Dumas acted intentionally.

[¶ 24] Dumas contends that an "instant" is not enough time in which to form the requisite intent to commit murder. *See* 17–A M.R.S. § 201(1)(A). "We review jury instructions as a whole for prejudicial error, to ensure they informed the jury correctly and fairly." *State v.*

*Roberts,* 2008 ME 112, ¶ 41, 951 A.2d 803, 815 (quotation marks omitted).

[¶ 25] The applicable statute defines the culpable state of mind of "intentionally" without mentioning time: "A person acts intentionally ... when it is the person's conscious object to cause ... a result." 17–A M.R.S. § 35(1)(A) (2009). The statute says nothing about how long an actor must harbor a conscious object to cause a particular result before he actually accomplishes it. It requires only that the intent to cause the result exist before the act. The time interval between intent and causation could be days, minutes, or, as the trial court instructed, "the instant before" the result is produced. In this re-gard, section 35(1)(A) does not change Maine law as it existed prior to the enactment of the criminal code. *See State v. Lafferty,* 309 A.2d 647, 664–65 (Me.1973) ("Maine law does not rely on a presumption of 'premeditation' ... to prove an essential element of unlawful homicide punishable as murder."). Because the court's instruction thus correctly stated the law and fairly informed the jury, it was not erroneous.[3]

The entry is:

Judgment affirmed.

---

**3.** Dumas contends that the court provided erroneous written instructions to the jury that differed from its oral instructions. He acknowledges, however, that the actual written version he believes was given to the jury does not appear in the trial court record. Although there are indications in the record suggesting that the court's written instructions accurately restated its oral instructions verbatim, the point is moot as we are limited to reviewing the existing trial court record and therefore do not address the merits of Dumas's argument. *See Beane v. Me. Ins. Guar. Ass'n,* 2005 ME 104, ¶ 9, 880 A.2d 284, 286 ("On appeal, we will not consider ... material relating to the merits of the appeal that was not ... included in the trial court record.").