STATE OF MAINE                    **FILED**             SUPERIOR COURT
PENOBSCOT, ss.                                          CRIMINAL ACTION
                                  AUG 31 2010           DOCKET NO: CR-10-044
                                                        WRA-PEN-8/31/2010
                          PENOBSCOT JUDICIAL CENTER
                          PENOBSCOT COUNTY SUPERIOR COURT
STATE OF MAINE,               BANGOR DISTRICT COURT
                                               )
        Plaintiff,                             )
                                               )
                                               )
vs.                                            )       DECISION & ORDER ON
                                               )       DEFENDANT'S MOTION TO
                                               )       SUPPRESS
MITCHELL SOUNIER,                              )
                                               )
        Defendant.                             )

Pending before the Court is the defendant's Motion to Suppress, filed pursuant to

M.R. Crim. P. 41A, various statements obtained by law enforcement officials during the

course of the investigating a sexual contact of which the defendant is now accused.

Hearing on the motion was held on June 22, 2010. Following the hearing, the parties filed

written argument. The Court received the final submission on August 3, 2010.

                                  BACKGROUND

In mid-December 2009, the Bangor Police Department ("BPD") received a

complaint alleging sexual abuse against a minor. Detective Joel Nadeau, a twenty-two

year veteran of the BPD, was referred the case and at all times relevant to this motion

acted as the lead investigator. On December 17, 2009, Detective Nadeau along with

DHHS Caseworker Katie Noyes interviewed the alleged victim. Around the same time,

Detective Nadeau had a conversation with the victim's father and the defendant's half-

brother, Gerald Sounier, Jr. ("Gerald Jr."). Gerald Jr. informed Detective Nadeau that his

daughter had come forward with an allegation that the defendant had touched various

private areas of her body on a day when she was being watched by him. Shortly after

1

learning this information, Gerald Jr. indicated to Detective Nadeau that he went to the Second Street apartment where the defendant resided and confronted him with the allegation. Based on the information he had received from the victim and her father, Detective Nadeau, accompanied by Caseworker Noyes, went to the Second Street apartment where the defendant resided with Gerald Sounier Sr. ("Mr. Sounier") on December 21, 2009. Once there, Detective Nadeau and Caseworker Noyes were permitted entry by Mr. Sounier and they proceeded to interview the defendant for approximately two and half hours. The defendant was neither charged nor arrested following the conclusion of the December 21 interview. During the course of the December 21 interview, the defendant raised the possibility of submitting to a polygraph examination. Detective Nadeau arranged for the defendant to undergo polygraph testing with Detective Timothy Cotton on December 23, 2009. The defendant arrived at the BPD stationhouse around 1:15 p.m. that day. Once there, Detective Nadeau introduced the defendant to Detective Cotton. After a pre-polygraph, "acquaintance" test, Detective Cotton administered a nine-question polygraph test. At the conclusion of the polygraph test Detective Cotton left the polygraph testing room, and Detective Nadeau conducted a post-polygraph interview. The conversations between the defendant and Detectives Cotton and Nadeau lasted for approximately four hours. The defendant left the BPD stationhouse after the December 23 interview without being charged or formally arrested. Based on the information BPD detectives received during the course of their investigation, the BPD formally arrested the defendant on January 8, 2010. The defendant was ultimately charged by criminal indictment with one count of Class A gross sexual assault and one count of Class A unlawful sexual contact on January 24, 2010. In the

2

instant motion, the defendant seeks to suppress all statements made to law enforcement officials during the interviews that took place on December 21, 2010 and December 23, 2010.

## ANALYSIS

### A. Consent to Enter the Residence

The Court begins by recognizing that the sanctity of the home and the privacy interests protected by the Fourth Amendment:

> It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest. It is not surprising, therefore, that the Court has recognized, as a basic principle of Fourth Amendment law, that searches and seizures inside a home without a warrant are presumptively unreasonable.

*Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984) (internal quotation marks omitted) (citations omitted); *see also State v. Rabon*, 2007 ME 133, ¶ 11, 930 A.2d 268, 274 ("It is beyond question that a person's home, and the rights of an individual within that home, have a special place in our jurisprudence.") (citation omitted); *State v. McLain*, 67 A.2d 213, 216 (Me. 1976) ("The Fourth and Fourteenth Amendments guarantee that a citizen's home will be free from arbitrary intrusion by the police."). The issue presented as a result of Officer Nadeau's entry into the apartment, the admissibility of a confession obtained from a third party who also resided at the

3

apartment,[1] is different from the ordinary issues arising from such an entry, which usually involve the seizing physical evidence or effecting an arrest.[2] The record discloses that Detective Nadeau accompanied DHHS Caseworker Katie Noyes to a home occupied by the defendant and his father in order to investigate a recent complaint alleging that the defendant had sexually abused his five year old niece. Police are generally said to have no greater authority than another person to enter another's home for the purpose of discussing an official matter unless: (1) the person is in the place the police seek to enter and (2) a person with the requisite authority over the premises consents to the entry. Wayne R. LeFave, Search and Seizure: A Treatise on the Fourth Amendment § 6.6(c), 478-79 (4th ed. & Supp. 2009).

The defendant makes no argument that Gerald Sounier Sr. ("Sounier Sr.") was without authority to consent to Detective Nadeau's requested entry into the residence located at 28 Second Street Apt. #2 in Bangor, Maine. *See United States v. Matlock*, 415 U.S. 164, 171 (1974). Rather, the defendant's first argument involves only whether Detective Nadeau, upon initiating contact with Sounier Sr. outside the residence, misrepresented the purpose for requesting entry into the property. It is this allegation that calls into question the legitimacy of Mr. Sounier's "consent."

The Law Court, consistent with Federal jurisprudence has long considered a warrantless entry into a person's home per se unreasonable unless "(1) it is supported by

---

[1] By addressing the suppression issue related to Det. Nadeau's entry, the Court is not intimating that it agrees that the statements should be suppressed if there had been no valid consent to enter. Because the Court has determined that the consent was valid, there is no need to decide this issue.

[2] While speaking with Detective Nadeu and Caseworker Noyes, the defendant consented to a search of his computer. Detective Brent Beaulieu arrived at the Second Street apartment shortly after being called by Detective Nadeau to conduct a search of the computer's "hard drive." Detective Beaulieu conducted the search without incident and the defendant makes no argument concerning the constitutionality of the Beaulieu computer search.

4

probable cause and exigent circumstances exist requiring a prompt search, without the delay occasioned by the need for a warrant; or (2) the search is pursuant to another recognized exception to the warrant requirement." *State v. Rabon*, 2007 ME 133, ¶ 11, 930 A.2d at 274 (quoting *State v. Leonard*, 2002 ME 125, ¶ 12, 802 A.2d 991, 994) (quotation marks omitted). Among the well-established exceptions to the warrant requirement, a search conducted pursuant to consent will generally obviate the constitutional infirmity of a warrantless entry. *State v. Nadeau*, 2010 ME 71, ¶ 17, -- A.2d -- (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 93 S. Ct. 2041, 36 L. ed. 2d 854 (1973)). For consent to be valid, it must be given freely and voluntarily. *Id.* (citation omitted). The State carries the burden of proving by a preponderance of the evidence "that an objective manifestation of consent was given by word or gesture." *Id.* (citation omitted).

Operating as a limitation on voluntariness, consent to search can be invalidated where a law enforcement officer obtains the consent by use of deceit, trickery or misrepresentation. *State v. Bailey*, 2010 ME 15, ¶ 22, 989 A.2d 716, 723 (citing *State v. Barlow*, 320 A.2d 895, 900 Me. 1974). In *Bailey*, the Law Court reiterated the "'practical necessity' for the use of deception in criminal investigations," while focusing the import of the rule to except those situations where law enforcement officials expressly and affirmatively misrepresent the purpose of the search or investigation to a person alleged to have given consent. *Bailey*, 2010 ME 15, ¶ 23, 989 A.2d at 723. Similar to most inquiries concerning "voluntariness" in the criminal law, the Law Court adopted the view that "deception as to purpose is viewed among all of the circumstances surrounding the individual's consent in the voluntariness analysis." *Id.* (citations omitted).

5

Reflecting upon the evidence received at hearing and having reviewed the transcripts of the recordings taken during the course of the BPD's investigation involving the defendant, the Court finds that Detective Nadeau's statements to Mr. Sounier on the afternoon of December 21, 2009, were not of the type of affirmative misrepresentations that would make Mr. Sounier's consent involuntary under the circumstances. Detective Nadeau and Caseworker Noyes arrived at the Second Street residence and were met at the door by Mr. Sounier. Detective Nadeau repeatedly indicated that he would like to "speak with" or "talk to" Mitchell. During the colloquy, Mr. Sounier equivocated about whether he would permit entry into the apartment and stated Detective Nadeau could either talk to the defendant in his police cruiser or outside the residence. Mr. Sounier also indicated that he had company at the Second Street apartment and did not want himself, or the third-party, to be present while Detective Nadeau and Caseworker Noyes spoke with the defendant. Detective Nadeau then changed the tenor of his request, indicating that he, and Caseworker Noyes, wanted to speak with the defendant, at least in part, to assess any "safety risks" implicated by the defendant's alleged interaction with the victim. At that point, Mr. Sounier permitted Detective Nadeau and Caseworker Noyes to enter the residence, set them up in the living room, and summoned the defendant from his bedroom.

Critical to the "voluntariness" inquiry under these circumstances is the exchange between Detective Nadeau and Mr. Sounier shortly before Mr. Sounier acquiesced to the entry:

> Detective Nadeau (DN): And part of what I need to talk to you about - I'm sure you probably know what that is – concerns everybody's safety here, okay? It's not just from

my perspective, and I really need to talk with Mitchell.
Now, you've talked with Gerry, Jr., right?
Gerald Sounier Sr. (GSS). Yeah.
DN: Okay. I would really appreciate your cooperation in this, Gerry, because there's no way that we can work on helping Mitchell and getting him some help without first talking to him, okay?

\*\*\*\*

DN: I would really like to talk to him now, Gerry.
GSS. Where are you --
DN. Because this isn't -- not only is this from my perspective, but this is DHHS.

\*\*\*\*

GSS. Is he in trouble, or what's the story?
DN. Nope, but I do have to talk with him. Really, it's from a safety perspective.

(12/21/09 Trans. Part 1 at 5-6.) The Court observes that Detective Nadeau's stated "purposes" for the visit, independent of each other, are each legitimate in their own right. Based on the information the BPD had received up until the point of the December 21 interview, Officer Nadeau had a valid reason for pursuing a criminal investigation into the defendant's alleged interaction with his niece and Caseworker Noyes had a valid reason for inquiring into the safety of the victim given her familial relationship with the defendant and his access to her. In other words, Detective Nadeau's two stated purposes for the visit are mutually exclusive and consistent with his testimony at hearing that investigations of child molestation are often "conducted concurrently" by law enforcement officials and DHHS.[3] Whether the de-emphasis of one purpose and over-emphasis of another purpose rises to the level of outright deceit, or constitutes the type of

---

[3] Detective Nadeau also testified at hearing that it was "standard procedure" for law enforcement officers to accompany DHHS caseworkers to investigate allegations of sexual abuse. This assertion finds support in cases similar to the one here. See State v. Merrill, 2003 Me. Super. LEXIS 150, *1 (June 16, 2003).

7

affirmative misrepresentation that, operating alone, would render Mr. Sounier's consent involuntary, is the narrow question at issue in the first part of the defendant's motion. *See Bailey*, 2010 ME 15, ¶ 23, 989 A.2d at 723.

The Court has surveyed a wide array of "deception as to purpose" cases decided in the federal courts and in courts of our sister jurisdictions.[4] Consonant with this Court's review of these cases and mindful of the exchange quoted above, the record discloses that Detective Nadeau did not affirmatively misrepresent to Mr. Sounier the purpose of his visit. He was there to speak with Mitchell Sounier and told his father. that he wanted to talk with Mitchell. Additionally, Mr. Sounier's hesitance to let Detective Nadeau enter was not to protect Mitchell from being interviewed, because he asked if Detective Nadeau could talk with Mitchell outside the apartment. At worst, Detective Nadeau deemphasized the purpose of his own investigation—pursuit of additional information in the course of investigating an alleged sexual assault—while perhaps over-emphasizing Caseworker Noyes' need to assess "safety risks" within the family.[5] Importantly, Detective Nadeau identified himself as a police officer and twice indicated to Mr. Sounier that he needed to speak to the defendant from the "perspective" of law enforcement officer. Nor was it necessarily disingenuous for Detective Nadeau to indicate to Mr. Sounier that the defendant "was not in any trouble" as of the December 21. At that time, Detective Nadeau was working on the bare allegation that the defendant had potentially

---

[4] The Court need not delve to deeply into this line of conflicted jurisprudence because of its finding that Officer Nadeau did not "expressly and affirmatively" misrepresent the purpose of the December 21 visit to the. *See generally* Wayne R. LeFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(n), 133-44 (4th ed. & Supp. 2009); *id.* § 8.2(n) n. 384.

[5] Lending further credence to the Court's assessment of Detective Nadeau's representations to Mr. Sounier, Caseworker Noyes did, in fact, engage the defendant in a lengthy conversation involving his sexual impulses, his mental stability, and his relationships with various family members in an effort to assess whether the alleged victim in the case would be jeopardized by any further contact with the defendant. (*See* 12/12/09 Trans. Part I at 58-66, 73-9.)

8

been involved with the victim, and other than the third-party assertions of misconduct, the police had little information to either affirm or dispel the allegations. On these facts, Officer Nadeau's statements to Mr. Sounier do not constitute the type of "affirmative misrepresentations" that would invalidate Mr. Sounier's acquiescence to the entry of the Second Street apartment.

B. Scope of Consent

The defendant contends that even if the Mr. Sounier's consent was not induced by impermissible deceit, trickery or misrepresentations, Detective Nadeau nonetheless exceeded the scope of consent by entering the Second Street premises and proceeding to interview the defendant for more than two hours. Where law enforcement officials obtain valid consent to enter or search a particular place, the warrant requirement is only waived to the extent granted by person giving consent. *Bailey*, 2010 ME 15, ¶ 26, 989 A.2d at 724 (citations omitted). "The standard for measuring the scope of a [person's] consent under the Fourth Amendment is that of objective reasonableness—what would a typical reasonable person have understood by the exchange between the officer and the [person]?" *Id.* (quoting *Florida v. Jimeno*, 500 U.S. 248, 250-51, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991)). The *Bailey* Court emphasized that neither the subjective beliefs of the person giving consent nor the subjective motivations of law enforcement officers informs the analysis. *Bailey*, 2010 ME 15, ¶ 26, 989 A.2d at 724 (citations omitted). The Court must determine under a totality of circumstances whether "a reasonable person would believe that some limitation was intended by the person giving the consent," *State v. Sargent*, 2009 ME 125, ¶ 11, 984 A.2d 831, 834 (citing *State v. Koucoules*, 343 A.2d 860, 867 (Me. 1974)). Although the Court is not convinced that "scope" issues relevant

to a Fourth Amendment analysis necessarily apply when the consent issue is raised in the context of official police questioning, that generally engenders Fifth Amendment concerns, the defendant's argument nonetheless fails to withstand analysis.

During the initial exchange between Detective Nadeau and Mr. Sounier at the door of the Second Street residence, Detective Nadeau repeatedly indicated that he had an urgent need to "talk" to the defendant. Regardless of Detective Nadeau's subjective representation that the conversation would only take a "few minutes," a reasonable person observing the exchange would have concluded that Mr. Sounier permitted entry into the apartment for the specific purpose of allowing Detective Nadeau and Caseworker Noyes to speak with the defendant. Mr. Sounier did not expressly limit the duration of teh interview. And, as with any conversation involving official investigations, the length of any conversation would vary according to the information given and the interaction among all the parties involved. The Court's review of the record exposes that the entry and the subsequent conversations that occurred in the Second Street apartment were consistent with Officer Nadeau's stated purpose to speak with the defendant from a law enforcement "perspective" and to allow Caseworker Noyes sufficient opportunity to assess the "safety risks" potentially implicated by the defendant's alleged contact with the victim. Viewed through the lens of objective reasonableness, the questioning that subsequently occurred in the Second Street apartment did not exceed the scope of the Mr. Sounier's consent to enter the residence.

C. Applicability of *Miranda* During December 21, 2010 Interview

The defendant urges the Court to suppress all statements made during the December 21, 2010, interview because he was not advised of his *Miranda* rights prior to

10

a custodial interrogation. As a general rule, *Miranda* warnings should issue in every circumstance where a defendant is both: "(1) 'in custody'; and (2) 'subject to interrogation.'" *State v. Higgins*, 2002 ME 77, ¶ 12, 796 A.2d 54 (quoting *State v, Michaud*, 1998 ME 251, ¶ 3, 724 A.2d 1222, 1226); *accord State v. Bleyl*, 435 A.2d 1349, 1358-60 (Me. 1981). In the familiar situation where a criminal suspect challenges his custodial status as a means to invoke the protections afforded by *Miranda* warnings, the Court must determine "whether a reasonable person standing in the shoes of the defendant would have felt he or she was not at liberty to terminate the interrogation and leave or if there was a restraint on freedom of movement of the degree associated with formal arrest." *Poblete*, 2010 ME 37, ¶ 20, 993 A.2d at 1109 (quoting *State v. Dion*, 2007 ME 87, ¶ 23, 928 A.2d 746, 750); *accord State v. Dumas*, 2010 ME 57, ¶ 15, 997 A.2d 760. Whether the defendant was in fact, "in custody," is a mixed question of fact and law that turns on a number objective factors, which the Court examines in their totality:

> (1) the locale where the defendant made the statements; (2) the party who initiated the contact; (3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant); (4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave; (5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave; (6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it); (7) whether the suspect was questioned in familiar surroundings; (8) the number of law enforcement officers present; (9) the degree of physical restraint placed upon the suspect; and (10) the duration and character of the interrogation.

11

*State v. Higgins*, 2002 ME 77, ¶ 113, 796 A.2d at 54-5 (quoting *State v. Michaud*, 1998 ME 251,¶ 4, 724 A.2d 1222, 1226.). In order for non-Mirandized statements to be admissible, the State bears the burden of proving by a preponderance of the evidence that "the statements were made while the person was not in custody, or was not subject to interrogation." *State v. Poblete*, 2010 ME 37, ¶ 20, 993 A.2d 1104, 1109 (citation omitted) . There being no issue that the defendant was interrogated by Detective Nadeau on December 21, 2009, *see Rhode Island v. Innis*, 446 U.S. 291, 299-300 (1980), the analysis concerns only his custodial status.

In light of the *Higgins/Michaud* factors, the Court finds that although Detective Nadeau initiated contact and Mitchell Sounier was the focus of the investigation, all questioning was conducted in familiar surroundings—primarily in the living room of the apartment the defendant shared with his father, Mr. Sounier. Once inside the apartment, Detective Nadeau began asking questions concerning a sexual contact involving a minor that allegedly occurred on or about November 27, 2009, and the defendant, from the inception of the interview, understood that he was the focus of the investigation. At no point during the two and half hour interrogation was the defendant placed in physical restraints and or otherwise restricted from moving about the apartment.[6] Detective Nadeau never communicated to the defendant whether he intended to make an arrest or

---

[6] The only apparent limitation on the defendant's freedom of movement in the Second Street residence came when Detective Beaulieu arrived to conduct a search of the defendant's computer files. The record is clear that the defendant consent to the search of his computer files and the defendant makes no argument to the contrary. (*See* 12/21/09 Trans. Part I at 57-8.) To effectuate the search, Detective Nadeau called Detective Brent Beaulieu over to the residence. Detective Beaulieu arrived a short time later and set up equipment to assist in the search the defendant's computer for "pictures of underage girls [and] underage boys." (*Id.* at 57.) When the defendant lit a cigarette in the room, Detective Beaulieu indicated that the smoke might interfere with the operation of the equipment, and encouraged the defendant to smoke elsewhere. At that point, Detective Nadeau followed the defendant to another room in the house where the defendant finished smoking. In this respect, the officers did not restrict the defendant's freedom of movement to the degree associated with formal arrest, they merely requested that he smoke elsewhere. It I also uncontroverted that Detective Beaulieu did not, at any point, interrogate the defendant.

12

intimated whether authorities had probable cause to do so. The fact that Detective Nadeau never expressly told the defendant he was free to leave or terminate the interview is effectively countered by the defendant's calm demeanor and willingness to answer questions throughout the interview. The defendant was primarily questioned by one officer, Detective Nadeau, who at no point became confrontational or verbally abusive toward the defendant. In short, there was "nothing in the [Detective Nadeau's] manner that would have conveyed to a reasonable person that he could not simply terminate the interview and ask the officers to leave." *Dumas*, 2010 ME 57, ¶ 15.

To the extent the defendant verbalized his concern that the tenor of the questioning made him feel like he was in a "courtroom," the defendant raised the issue in two distinct contexts. On the first occasion, the defendant indicated that he did not want to divulge any information that would jeopardize his half-brother's ability to get benefits from DHHS. Detective Nadeau quickly redirected the conversation, indicating that he was only concerned with the allegations of sexual contact. Similarly, Caseworker Noyes indicated that she had no control over DHHS benefits and that she was only participating in the interview from the standpoint of protecting the alleged victim should information develop to make precautionary measures necessary. On the second occasion, more fully developed for the purposes of the voluntariness inquiry below, the defendant stated he felt like he was in a "courtroom" in response to a line of questioning in which Detective Nadeau intimated that the victim had "medical indications" of a sexual contact. Apart from the defendant's views concerning the theme of the questioning, the "courtroom" comments do not bear a sufficiently close nexus to the issue of whether the defendant felt he could terminate the interview or whether he felt restrained to the degree normally

13

associated with formal arrest. Even if the Court weighed the "courtroom" comments in favor of custodial status, the import of other factors—most notably, the familiar surroundings, the freedom from restraint, and the cordiality of the interviewers—suggest that defendant was not in custody. Because the defendant was not in custody during the December 21, 2009, interview at his home, the need to issue *Miranda* warnings did not arise and the defendant's statements do not warrant suppression on *Miranda* grounds.

D. Voluntariness of the Defendant's Statements During December 21, 2010 Interview

Regardless of whether the defendant was in custody at the time of the December 21, 2009, interrogation, the State carries the additional burden of proving the voluntariness of the defendant's statements beyond a reasonable doubt. *State v. Dion*, 2007 ME 87, ¶ 33, 928 A.2d 746, 752. "A confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all the circumstances its admission would be fundamentally fair." *State v Coombs*, 1998 ME 1, ¶ 10, 704 A.2d 387, 390-91; *see also Poblete*, 2010 ME 37, ¶ 20, 993 A.2d at 1110. The suppression court must utilize a totality of the circumstances approach in determining whether a statements made during an interrogation are, in fact, voluntary. *Lockhart*, 2003 ME 108, ¶ 30, 830 A.2d at 444 (citation omitted). Ultimately, the question of voluntariness is determined by a multi-factored analysis, including:

> . . . the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of Miranda warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

14

*Id.* (quoting *State v. Sawyer,* 2001 ME 88, ¶ 9, 772 A.2d 1173, 1176).

The Court's determination on the issue of custodial status marginalizes the vast majority of the "voluntariness" factors ordinarily imputed by the *Lockhart* test. (*See* Def.'s Mot. to Supp at 16) ("All the in custody factors mentioned by the defendant above go to the confession here."). Irrespective of the custodial findings, however, three factual occurrences relevant to certain portions of the December 21 interview raise additional questions as to the voluntariness of the defendant's statements on that day.

The Court recognizes that Detective Nadeau remained vigilant in his attempt to extract additional information by encouraging the defendant to tell the truth or explain "what happened." This interrogation tactic, in and of itself, does not justify suppression. *See, e.g., State v. Knights,* 482 A.2d 436, 442 n. 4 (Me. 1984) ("Mere admonitions or exhortations to tell the truth will not, by themselves, render a statement involuntary"). In a similar vain, Detective Nadeau's efforts to obtain information by implying that he could assist the defendant in getting "help" or counseling for his sexual tendencies does not fall into the traditional concept of "a promise of leniency." *Lavoie,* 2010 ME 76, ¶ 21, -- A.2d-- (quoting *Coombs,* 1998 ME 1, ¶ 11, 704 A.2d at 391). Detective Nadeau never promised the defendant leniency in a criminal case, and at the time of the December 21 interview, no formal charges had been filed against the defendant. Furthermore, while the defendant made certain admissions concerning his irregular sexual desires, the record demonstrates that the defendant appeared more motivated to distance himself from the allegation that he had had genital to genital contact with the alleged victim than coerced into making certain statements based on the possibility that he might receive psychiatric counseling.

15

More troublesome for the Court are two instances where Detective Nadeau implied that the investigation, previous to the time of the interview, had yielded certain evidence potentially linking the defendant to the sexual contact alleged to have been perpetrated upon the victim. In the first instance, Detective Nadeau specifically asked the defendant, "why there would be indications, medical indications," suggestive of sexual contact in the victim's vaginal area. (12/21/09 Trans. Part I at 51-52.) In the colloquy that followed, the defendant indicated he had heard the child had a rash and Detective Nadeau stated that the condition was not a rash and that she had received medical attention. He then stated that "she went to the doctor and there was some irritation and that this was after she had been at the apartment. (*Id.* at 53.) He later stated "Well, what I'm saying is that this was found. She was taken to a doctor for it. Okay. And this was right after she had been here. (*Id.* at 54.) The Court has exhaustively combed the entire suppression record for evidence of whether the Detective Nadeau affirmatively misrepresented whether, in fact, the victim had an "irritation" in her vaginal area and whether a doctor had subsequently confirmed its existence. The only motion evidence in this regard is the Detective's assertion that there was no "medical evidence" in the case and there is no evidence that she did not get medical attention or did not have a rash. An absence of "medical evidence" does not indicate the absence of irritation or medical attention. At most, Detective Nadeau intimated that a doctor examined the irritation but he does not intimate that any aspect of the examination linked the defendant to a crime. In the absence of any evidence suggesting that Detective Nadeau's statements concerning the doctor visit or irritation were affirmatively misstated, or outright falsehoods, the Court finds that Det. Nadeau's conduct in possibly reinforcing defendant's potential

16

misunderstandings is not of the type or degree that renders the defendant's statements "involuntary." *State v. Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d 1173, 1176. The same cannot be said for the second instance, which the Court discusses independently below.

Toward the latter part of the two and half hour interview, the following exchange took place between Detective Nadeau and the defendant:

> Detective Nadeau (DN): But there was something there, Mitchell. You know what I'm saying? I don't know whether it was from licking or—I don't know whether it was touching or maybe a combination of the two, but that's kind of why I'm talking with you here.
>
> ****
>
> Mitchell Sounier (MS): Some bacteria from my hands or something might have got from her hands to -- because she was playing with herself, like trying to take my hand down there. Before she even -- like when she was going like this, going like this, like she liked it –
> (DN): Yeah.
> (MS): I was like, oh, my word, this is not good, and I took my hand off her, and then she was like going like that, taking her panties down, and I said Lulu no, and I got right up, and I sat down. I don't know what came up on the test. It might have come from my hand or something. I don't know.
>
> (DN): It would only be . . .
> (MS): She might have touched herself.
>
> (DN): Yeah, but it would only be from direct contact.
> (MS): With what, though?
>
> (DN): It's not a—it's not a living bacteria. *What about DNA?*
> (MS): I don't know.
>
> (MS): *Is there any reason why your DNA from like your hand or your sweat—what would the reason be that they'd find that?*

(12/21/09 Trans. Part I at 115-16.) The Court finds that Detective Nadeau had no substantive basis for implying that law enforcement or medical officials had collected DNA evidence linking defendant to the sexual assault. Asking "what would the reason be that they'd find that?" is tantamount to announcing that his DNA had been found on the child. At the suppression hearing, Detective Nadeau admitted on cross-examination that he had no "scientific evidence" linking the defendant to the sexual assault at the time of the December 21 interrogation, and the Court agrees with defendant that this particular misrepresentation goes well beyond the bounds of "trickery" police are permitted to employ during interrogations. The affect of Detective Nadeau's DNA comments are striking. By deceitfully infusing non-existent DNA evidence into the conversation, the defendant became more amendable to Detective Nadeau's interrogation tactics. The suppression record clearly shows that the vast majority of the incriminating statements made by the defendant during the December 21 interview occurred only after Detective Nadeau had insinuated there was DNA evidence linking the defendant to the sexual assault he is now formally charged with perpetrating . For these reasons, the Court finds that any statements made by the defendant after the mention of "DNA" evidence, were not the product of the defendant's free will and rational intellect, but instead the product of official police coercion that renders them inadmissible at trial.

For the purposes of clarification, the Court does not order the suppression of any statement the defendant made while speaking with Detective Nadeau and Caseworker Noyes prior to the mention of the "DNA" evidence, after that point, Page 116, line 16, the Court orders the remainder of the December 21, 2009 interrogation, as applied to the defendant suppressed.

18

E. The December 23, 2010 Interview

The Court's decision to suppress statements the defendant made during the latter portion of the December 21, 2009, interrogation on grounds of involuntariness complicates somewhat the analysis of the defendant's second meeting with police in which the defendant participated in an interview and polygraph examination. The Court finds that the potential challenges to the December 23 interrogation fall broadly into two broad categories: (1) Whether the defendant was in fact subject to a "custodial interrogation" during the December 23 interview, and if so, whether the Detective Cotton's prophylactic *Miranda* recitation was sufficient to appraise the defendant of his rights and to permit him to effect a valid waiver; and (2) Whether the statements the defendant made on December 23 can be said to have been "voluntary" in light of the Court's decision above.

1. Custody and *Miranda*

The Court finds that the defendant was not "in custody" during the December 23, 2009, polygraph interrogation. As a consequence, any statements made during the course of the interview on December 21, 2009, do not warrant suppression on *Miranda* grounds. *See, e.g., State v. Bragg*, 604 A.2d 439, 440 (Me. 1991) ("*Miranda* warnings are required *only when* a defendant is in custody and subject to interrogation. When a defendant voluntarily goes to the police station, knowing he is free to leave, he is not entitled to a *Miranda* warning prior to questioning.") (emphasis added) (citation omitted).

Applying the *Higgans/Michaud* factors noted in the analysis above, the Court observes that the defendant agreed to submit to a polygraph examination before Detective Nadeau's deceitful tactics tainted the voluntariness of the statements obtained during the

19

December 21 interrogation.[7] Shortly thereafter, Detective Nadeau arranged for the defendant to meet with Detective Timothy Cotton for the purposes of undergoing polygraph examination at the BPD police station. On December 23, 2009, the defendant received a ride to the BPD police station from his father Mr. Sounier. After arriving, the defendant was escorted to the third floor of the stationhouse via a "secure" elevator. In route, the defendant and the escorting officer also crossed through at least one "secure" doorway. Once on the third floor, the defendant was introduced to Detective Cotton and given some written materials explaining the polygraph examination process. Detective Cotton indicated to the defendant and his father that the entire examination might take "some time," at which point Mr. Sounier decided to leave the premises. Detective Cotton then accompanied the defendant into a small room with one window that contained the polygraph equipment. Prior to the administration of pre-test interview, see Lavoie, 20010 ME 76, ¶¶ 5-6, -- A.2d -- (noting the procedural protocol generally used during administration of polygraph testing), Detective Cotton engaged the defendant in a short, informal conversation intended to determine whether the defendant understood the nature of the polygraph testing and to ascertain whether he had come to the BPD stationhouse voluntarily:

> Mitchel Sounier (MS): Like, I still have the right to not want to do it, right?
> Detective Cotton (DC): Sure.
> MS: All right.
> DC: A polygraph is completely voluntary.

****

---

[7] During the December 21, 2009, interview, the defendant himself raised the possibility of taking a polygraph examination. (12/21/09 Trans. Part 1 at 66, 69.) Detective Nadeau specifically asked the defendant "if you were going to take a polygraph exam and the person that was doing the exam said to you, did you touch Alexia's privates, what would the polygraph say?" (12/21/09 Trans. Part 1 at 71.) In response, the defendant responded, "I'd say no." (Id.)

20

DC: Let me explain briefly. Number one, a polygraph is voluntary.

MS: Right.

****

DC: If there's any questions today that you don't want to answer, you don't have to answer. You can just say, I'd rather not talk about that right now. That's cool. I'm good with that. Listen, you're coming in to clear your name, you know.

MS: Right.

DC: The only thing I ask of you is that you be a hundred percent truthful.

MS: The only thing I'm worried about—that's what I'm worried about.

DC: What are you worried about?

MS: When I'm truthful and I still get something on the thing that shakes because of my—my nerves right now are like, you know.

DC: You know, I've taken like 35 polygraphs, and I'm nervous on every one of them, too, but I've passed them. The only thing I'd say you to is if you're thinking about or planning on lying about this, don't take the test. That's the truth. I'm giving you that out.

****

DC: Let's get through the first part of it. Let's get the waivers—tell me that you want to be here. Again, you don't have to be here. You can leave any time you want. I only ask if you are connected to the component, you don't run out and drag everything with you because it's expensive.

MS: No.

DC: Okay. Again, if you want to lie to me, don't stay. I don't want you here, and I know you wouldn't want to do that.

MS: Okay.

DC: Any time you're in a police department—you're not here—you're here voluntarily, right? You came here on your own? You came here because you wanted to take the test, right?

MS: Yup.

(12/23/09 Trans. at 3, 4, 5-6, and 7.)

Detective Cotton then issued *Miranda* warnings[8] and the defendant executed

[8] During Detective Cotton's *Miranda* recitation the following exchange took place:

DT: If you decide to answer now questions with or without a lawyer present, you have the right to stop answering at any time. You also have the right to stop answering at any time until you can consult an attorney. Do you understand those rights?

MS: Yeah. What's your recommendation on that? Should I get one?

*DT: My recommendation is come in here and tell me the truth about this incident, especially since you didn't do it.*

MS: Okay.

(12/23/09 Trans. at 7-9) (emphasis added). The Court has been unable to locate any controlling precedent where suppression is the *de facto* result of a technical violation of *Miranda*—or where the defendant perhaps ambiguously invokes his right to consult with an attorney prior to questioning—in the event the suppression court determines that a person is not "in custody" and *Miranda* warnings are otherwise not required. (*Id.*); *see, e.g., State v. Barnes*, 2001 ME 51, ¶ 4, 768 A.2d 596, 597 (citing *Bragg*, 604 A.2d at 440) ("[T]he giving of Miranda warnings when not required does not per se necessitate a determination whether the defendant knowingly and voluntarily waived the rights in the warning before questioning can proceed.") (citation omitted). In this respect, the Court sees the defendant's interaction with Detective Cotton as having no substantive legal difference from the situation in which a law enforcement officer approaches someone on the street, asks that person if he or she would be willing to answer questions, in response to the person's question, tells the person he should talk with the officer; and the person then proceeds to make incriminating statements. Assuming that none of the hallmarks of "custodial interrogation" would apply in this scenario, the person's statements would no doubt be admissible at trial.

The instant facts are readily distinguishable from those in *State v. McConkie*, 2000 ME 158, 755 A.2d 1075. There, the Law Court held that despite the absence of any need to issue Miranda warnings in a non-custodial setting, it was impermissible for a law enforcement official to "affirmatively mislead [the defendant] as to his constitutionally protected right against self-incrimination" by stating that the substance of their conversation would "stay confidential." *Id.* at ¶¶ 4, 10, 755 A.2d at 1077, 1078. Unlike *McConkie*, Detective Cotton did not affirmatively mislead the defendant by telling him that he did not have a right to consult or have counsel present during questioning, but only "recommended" that the defendant proceed with the polygraph interviews in order to clear his name from the most egregious of the allegations uncovered during the investigation of this matter. On the continuum of coercive tactics used by police to elicit statements from suspects, this Court recognizes that police are no doubt encouraged, and generally required, to attempt to resolve any ambiguity in a defendant's ambiguous invocation of a Fifth Amendment right to counsel "by asking the defendant questions for clarification." *State v. Alley*, 2004 ME 10, ¶ 28, 841 A.2d 803, 811. Despite Detective Cotton's improvident response to the defendant's ambiguous assertion of his Fifth Amendment right to counsel, *see Davis v. United States*, 512 U.S. 452, 459 (1994), Detective Cotton did in fact follow the *Miranda* recitation with further questions directed to ensure that the defendant fully understood "all" of his rights, and the suppression record shows that the defendant well understood that he was not required to participate in the interview and that he could leave at any time. (12/23/09 Trans. Part I at 9-11.) The defendant subsequently executed the *Miranda* waiver form. (12/23/09 Trans. Part I at 11; St.'s Ex. 2.) As a consequence, even if the Court were required to decide the interesting issue raised here—whether simply making a defendant aware of his Miranda rights, in the absence of any requirement to do so, requires the suppression court to address claimed problems of waiver or ambiguous invocations of a right to counsel—the suppression record adequately supports the conclusion that the defendant nonetheless effected "knowing, intelligent, and voluntary waiver" of his Miranda rights by a preponderance of the evidence. *Coombs*, 1998 ME 1, ¶ 15 704 A.2d at 392.

22

"Consent and Waiver" forms, (*See* St.'s Exs. 1 & 2), with respect to both his *Miranda* rights and the polygraph test. Detective Cotton then proceeded with the pre-polygraph, "acquaintance test," and then the polygraph examination itself. Detective Cotton testified that the door to the room initially remained open, but that at some point he closed the door for "privacy." In addition, Detective Cotton reiterated during the pre-polygraph, "acquaintance" portion of the interrogation that the defendant was "not under arrest" and that he remained "free to leave." (12/23/09 Trans. at 65.) Following the polygraph testing, Detective Cotton informed a waiting Detective Nadeau of the "results." Detective Nadeau subsequently entered the examination room and proceeded to conduct the post-test interrogation. The entire interrogation lasted approximately four hours. At the conclusion of the examination by Detectives Cotton and Nadeau, the defendant left the BPD stationhouse at his own behest and the defendant was not formally arrested until January 8, 2010.

From all the foregoing, the Court finds that the defendant was not "in custody" at any point during the December 23 interview. The defendant, pursuant to his own suggestion during the December 21 interview, agreed to submit to polygraph testing. Critically, defendant expressed a willingness to participate in polygraph testing before Detective Nadeau impermissibly confronted the defendant with the false claim that police had obtained "scientific evidence" linking him to the sexual assault. On the day of the December 23 interrogation, the defendant secured his own ride down to the BPD police station. Prior to any questioning, Detective Cotton scrupulously endeavored to determine whether the defendant had voluntarily agreed to the polygraph examination and repeatedly informed the defendant that he could terminate the interview at any time and

leave the premises. In response, the defendant affirmatively represented that he understood that any participation was voluntarily and he could cease to answer questions at any time. Despite the total length of interrogation, the defendant was permitted breaks and allowed to smoke a cigarette. At no point did either Detective Cotton or Detective Nadeau restrain the defendant or otherwise intimate that he was not free to leave. On these facts, the Court finds that the State has carried its burden of establishing by a preponderance of the evidence that defendant was not "in custody" at any point during the December 23 interrogation. As a result, any grounds for suppression derivative of his Fifth Amendment rights, and Officer Cotton's recitation of *Miranda* warnings, will not operate to make the statements obtained during the December 23 interrogation inadmissible at trial.

### 2. Voluntariness

As noted above in the analysis of the December 21 interrogation, the State bears the burden of proving beyond reasonable doubt that the statements made during the December 23 interrogation were "voluntary" within the meaning intended of the Art. I, § 6 of the Maine Constitution. *See State v. Rees*, 2000 ME 55 , ¶¶ 2-9, 748 A.2d 976, 977-779 (reaffirming that Maine has a "more stringent standard of proof for establishing the voluntariness of statements in order to better secure the guarantee of freedom from self-incrimination"). In this respect, whether the defendant's statements to Detectives Cotton and Nadeau on December 23 were "voluntary" remains at least partially contingent on the Court's suppression of certain statements the defendant made during the December 21 interrogation to the extent the Court has determined some of those statements to be "involuntary." Because the issue of voluntariness here is of constitutional dimension, and

not a mere technical violation of *Miranda*, the "fruit of the poisonous tree doctrine" would appear to apply precisely because the statements the defendant made during the December 21, some suppressed on grounds of voluntariness, were the primary impetus for encouraging the defendant to participate in a polygraph examination. *Compare State v. St. Yves*, 2000 ME 97, ¶¶ 15-16, 751 A.2d 1018, 1022 (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)) (noting that "the fruit of the poisonous tree doctrine only applies to evidence seized as a result of a violation of *constitutional* rights, and does not apply when the error on the part of law enforcement is merely technical or administrative, such as an error in the administration of Miranda warnings") (emphasis in original) *with State v. Pinkham*, 510 A.2d 520, 522-23 (Me. 1995) (quoting *Oregon v. Elstad*, 470 U.S. 298, 317-18 (1985)) (providing that incriminating statements made prior to *Miranda* warnings, followed by administration of warnings and subsequent admissions post-warning are subject to independent assessments for voluntariness). The substantive import of the Court's observation above are contained in the Law Court's decision in *State v. O'Hare*, 627 A.2d 1001 (Me. 1993). In *O'Hare*, the Law Court adopted the 11th Circuit's approach to situations analogous to the one presented here and fashioned a rule governing the admissibility of statements made to law enforcement authorities that follow earlier statements determined to be involuntary. *See Leon v. Wainwright*, 730 F.2d 770, 772 (11th Cir. 1984) (noting that key determination is whether the "coercion surrounding the first statement had been sufficiently dissipated so as to make the second statement voluntary"). Where a previous statement to police is determined to be involuntary "the later statement will be held to be voluntary only if there is a 'break in the stream of events . . . sufficient to insulate the statement from the effect of all that went before.'" *Id.*

(quoting *Clewis v. Texas*, 286 U.S. 707, 710 (1967).

At the threshold, because the Court found no Fourth Amendment violation with respect to the December 21 entry of the Second Street apartment, there is no reason to employ *Wong Sun* on these facts. Applying the rule sanctioned by *O'Hare*, the Court finds that there was a sufficient break in the stream of events between the December 21 interrogation and the December 23 interrogation to reconcile the defendant's "mental freedom 'to confess to or deny a suspected participation in a crime.'" *Leyra v. Denno*, 347 U.S. 556, 561 (1954). While the suppression record undoubtedly shows that defendant expressed some reservations about agreeing to under go a polygraph testing, (*see, e.g.*, 12/23/09 Trans. at 9-10), the interview occurred almost forty-eight hours after the conclusion of the December 21 interrogation. In that time, the defendant had coordinated with Detective Nadeau to take a polygraph examination and voluntarily made his way down to the BPD police station on that day. *See Bragg*, 660 A.2d at 440. Critically, as noted above in the Court's analysis of the defendant's custodial status, the defendant agreed to undergo polygraph testing *before* Detective Nadeau's affirmative misrepresentations regarding "scientific evidence" rendered the remaining portion of that statement inadmissible due to voluntariness concerns. In addition, the suppression record discloses that the defendant made clear, affirmative representations that he understood Detective Cotton's precautionary warnings concerning the voluntariness of his participation and that he recognized his right to terminate the discussions and leave the police station. Given the intervening events between the December 21 and December 23 interrogations and the interaction between Detective Cotton and the defendant during the polygraph interview, the defendant's statements of December 23 were sufficiently

26

removed in time and effect from the potential encroachment of the involuntary statements elicited during the December 21 interrogation. The facts therefore demonstrate a "break in the stream of events . . . sufficient to insulate the [December 23] statement[s] from the effect of all that went before.'" *O'Hare*, 627 A.2d at 1004 (quoting *Clewis*, 286 U.S. at 710).

Having disposed of the constitutional concern, the court finds additional facts indicating that the State has carried its burden of proving the defendant's December 23 statements voluntary beyond a reasonable doubt. Beyond reiterating the defendant's express understanding that his participation in the polygraph interrogation was entirely voluntary, (*see* 12/23/09 Trans. 3-11), the very same factors that weigh against a finding that the defendant was "in custody" during the December 23 interview militate against a finding that any "admission made by the [defendant] after polygraph testing . . . although made in repose to questions prompted by the polygraph examiner's interpretation of reactions to questions asked during testing," *Lavoie*, 2010 ME 76, ¶ 16, -- A.2d -- (citation omitted), were "involuntary." Although the possibility of receiving "help" for his "problem" again came up during Detective Cotton's and Detective Nadeau's conversations with the defendant following the polygraph examination, the defendant was more clearly motivated to speak with the detectives to attack the allegation that he had genital to genital contact with the alleged victim than by the potential inducement of receiving psychiatric counseling. *Lavoie*, 2010 ME 76, ¶ 21, -- A.2d -- (citation omitted). Although Detectives Cotton and Nadeau were, to some extent, impliedly confrontational in the way they were asking direct questions, confrontational interviewing practices will not render statements a suspect's involuntary. *State v. Candage*, 549 A.2d 355, 360 (Me.

27

1988). Unlike the December 21 interview, neither Detective Cotton nor Detective Nadeau affirmatively misrepresented any fact that would tend to impermissibly color the defendant's perception of reality. And, other than the inherent deception involved with the administration of the polygraph testing itself, *see Lavoie*, 2010 ME 76, ¶ 16, neither detective employed the level of trickery or deceit that would impair the voluntariness of the defendant's statements on December 23. Furthermore, although the defendant stated that he had only slept for two hours the night before, and made repeated assertions concerning his "jittery" nerves on account of past drug use, the defendant was calm and appropriately responsive to questions throughout the four-hour duration of the interrogation . *Id.* at ¶ 19. There is nothing in the suppression record to indicate that the defendant suffered from the type of hysteria or other mental deficiency that would make the admissibility of statements at trial inimical to the concept that they were not a product of his own rational choice and free thinking. It is notable that the Defendant, toward the end of the Detective Nadeau's questioning, specifically requested that the detectives retune the polygraph questions so that he could again take the test. On the voluminous facts presented in the suppression record, the Court finds the defendant's statements of December 23 voluntary beyond a reasonable doubt.

The entry is:

1. The defendant's Motion to Suppress statements obtained during the December 21, 2009, interrogation is **GRANTED** in part and **DENIED** in part.

2. The defendant's Motion to Suppress statements obtained during the December 23, 2009, interrogation is **DENIED.**

Dated: August 30, 2010

William R. Anderson

State v. Mitchell Sounier
Docket No. PENCD-CR-2010-44


State's Attorney:
    Michael Roberts, DDA
    Penobscot County District Attorney's Office
    97 Hammond Street
    Bangor Maine 04401

Defense Attorney:
    Hunter Tzovarras, Esq.
    PO Box 70
    Hampden Maine 04444